**Perry JORDAN, Appellee,**

v.

**NORTH CAROLINA NATIONAL BANK, Appellant.**

**No. 75–1544.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 10, 1975.

Decided Oct. 14, 1977.

Rehearing and Rehearing In Banc Denied Dec. 21, 1977.

---

Dennis Rapps, Brooklyn, N. Y., and Sidney Kwestel, New York City, on brief for amicus curiae for National Jewish Commission on Law and Public Affairs.

Jonathan Wallas, Charlotte, N. C. (J. Levonne Chambers, Adam Stein, Robert Belton, Chambers, Stein, Ferguson & Belton, Charlotte, N. C., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, and WINTER and WIDENER, Circuit Judges.

, ALBERT V. BRYAN, Senior Circuit Judge:

Perry Jordan complained in the District Court that the North Carolina National Bank practiced an employment discrimination against her because of her religion, in violation of the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e *et seq.* Before voluntarily terminating her previous employment with the bank in 1969, she had become a Seventh Day Adventist, and in May 1970 she unsuccessfully sought reemployment with NCNB. Her failure, she charged, was the result of the bank's refusal to allow her to observe the tenet of her sect forbidding work on Saturday, its Sabbath, that is, from sundown on Friday to sundown on Saturday.

Upon trial in March 1975 Jordan prevailed. The Court ordered the bank to offer Jordan the next vacancy in its Charlotte office, awarding her at the same time backpay, attorney's fees, expenses and costs. Decision rested on the finding that NCNB had made insufficient efforts to accommodate Jordan's creed and so had deprived her of rights accorded by Title VII.*

J. W. Alexander, Jr., Charlotte, N. C. (John O. Pollard, W. T. Cranfill, Jr., Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for appellant.

---

* At the time of these 1970 occurrences Title VII, 42 U.S.C. § 2000e–2(a)(1) read as follows:

"(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; "

Then coexistent, Regulation 1605.1(b), 29 CFR 1605 of the Equal Employment Opportunity Commission, as relevant, declared:

"(b) The Commission believes that the duty not to discriminate on religious grounds, . . . includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example,

Appealing, the bank contends that her application stipulated that her employment must be accompanied by a "guarantee" that she would never be called upon to work on Saturday, and since the bank could not "make reasonable accommodations" to this demand, NCNB was not in violation of the Act. We agree.

The District Judge failed to recognize the stipulation. This omission amounts to a "clearly erroneous" finding or an erroneous conclusion of law, for copious evidence established the proviso. It precludes a determination of fault on the bank's part for, in our view, this demand of Perry Jordan could not be "reasonably" accommodated by her prospective employer at all and certainly not "without undue hardship". *Cf. Trans World Airlines v. Hardison*, 432 U.S. at 72, 97 S.Ct. 2264.

The record fully discloses that this condition was repeatedly pressed by Jordan. On cross-examination she was asked and answered as follows (71 *et seq.*):

"Q. Well, did the bank offer you work?
A. If I would work on Saturday *sometime*. (Accent added.)
Q. And you wouldn't do that?
A. No, sir, I would not work on Saturdays.
Q. . . . . Is there any circumstance whatever under which you would work between sundown Friday afternoon and sundown Saturday?
A. No, sir.
Q. And you made that clear to Mr. Rainey [the employment manager]?
A. I did.
Q. And to Mrs. Bradshaw [personnel interviewer]?
A. I did.

Q. And further you told them that you had to have a guarantee in advance before you undertook a job that you would never be asked to work during that period of time?
A. That's not quite right.
Q. Well, you testified in a deposition here sometime ago in this case, didn't you?
A. Uh, huh.
Q. And I'll hand you a transcript of that deposition and ask you to look at page 17, lines 14 through 17.
A. Okay.
Q. Have you read that?
A. Yes.
Q. In that you were asked this question, were you not? 'Do you insist that an employer guarantee you in advance that you will never have to work on Saturdays under any circumstances whatsoever?'
A. Okay, I'm sorry, yes, I do insist that.
Q. And you said yes, that you do require such a guarantee in advance.
A. Yes, sir.
Q. And that has been your position all along since you came there to reapply?
A. Yes.
Q. You weren't willing to accept work and wait until a later day to see if arrangements could be made to relief you, or the nature of the case, or anything. You wanted this guarantee in advance.
A. Well, sir, nobody said they would later on excuse me from working on Saturdays.
Q. But I don't think that's exactly the question I had for you. My ques-

may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer." This regulation was, in effect, approved and paralleled by Congress in 1972 when to the same end it enacted 42 U.S.C. § 2000e(j) prescribing that:
"(j) The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."
*See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (June 1977).

tion was that no matter what circumstances arose you wanted them to guarantee you at that time without waiting for future events, guarantee you at that time that you would never be asked to work between sundown Friday, and sundown Saturday?

A. I think so."

Later she re-emphasized her insistence upon a guarantee:

"Q. And here today, February of 1975, your position is the same, you would not take any job with this bank unless you had a blanket guarantee in advance that under no circumstance would you ever be called upon to work for this bank from Friday sundown to Saturday sundown?

A. Would you please tell me what you mean about a blanket guarantee?

Q. Just what I said, an overall, unrestricted guarantee that you would—there would be no circumstance under which you would ever be asked to work between sundown Friday and sundown Saturday.

A. I would not accept a job unless I was told that.

Q. Unless you had that guarantee?

A. That's true, sir.

Q. And you want that guarantee in writing, really, don't you?

A. No, I do not.

Q. But you want a solid guarantee?

A. I would like, yes, sir, to be told that I wouldn't have to work on Saturday.

Q. A guarantee, not just told. The word had been guarantee. You want to be guaranteed that you will never be asked to work under any circumstance whatever. Those are the exact words of the deposition.

A. That's true, sir."

On recross-examination, she acknowledges that her exaction was the reason she was not employed:

"Q. Mrs. Jordan, Mr. Rainey told you that he could not guarantee that you may not be called on to work on some day under some circumstance on Saturday, isn't that right?

A. He told me that he couldn't—yes, that's right.

Q. Couldn't guarantee that you wouldn't be called on under some circumstance on some Saturday to work?

A. Uh, huh."

When Jordan sought a position in 1970, she was interviewed by Harris Rainey, then employment manager for the bank, and he testifies to what was said by each of them:

"Q. Would you tell us what transpired between you and the plaintiff on that occasion?

A. As I recall Mrs. Jordan requested a full-time position with the bank and at that time she asked that she be guaranteed that she would not be able to work on Friday after sundown until Saturday sundown.

Q. What was your response to that?

A. My response to that was that we would certainly try to accommodate her, we had never had a problem with that but we couldn't give her a formal binding guarantee.

Q. And what was her response?

A. Her response was that she couldn't accept the position on that basis."

Subsequently this exchange between them was related by Rainey:

"Q. Did you ever deny her employment?

A. No, sir. As a matter of fact, we were—it was, as I recall—you didn't ask this, but as I recall it was rather frustrating. We wanted to give her a job and we wanted to accommodate her and the reason we did is because she was a previous employee who had a good record, but because she wanted this absolute guarantee it was frustrating, we just couldn't give her a position."

Of his interview with Jordan, Rainey further stated:

"Q. Was there one or more than one thing that stood between her and employment or the lack of employment at your bank?

A. The only thing that stood between her lack of employment with the bank was the fact that she required an absolute guarantee and our feeling at that point was that we just couldn't give anybody an absolute guarantee because of emergency situations that might come up and the fact that other people don't have that same guarantee."

Of particular importance is the query of the District Judge, during the examination of Perry Jordan, as to whether "there ever had been any serious conversation about employment on the basis that apparently you [attorney for the bank] have suggested at one time, that is, on the theory that we'll [sic] everybody reserve his own principle and cross that bridge when we come to where the two principles absolutely conflict at a specific fact situation". Counsel replied, without refutation by Jordan's lawyer, that he had suggested that her employment be put on a trial basis, to ascertain if actually there was a problem of work on her Sabbath. The idea was not accepted.

During this colloquy the Court cryptically posed the controversy in this way:

". . . I suppose what you are talking about is that there was no refusal to hire but there was a refusal to guarantee, as your witness has described it . .

MR. ALEXANDER [attorney for the bank]: That is exactly the case.

COURT: . . . a refusal to guarantee that there never would be an issue arise about Saturday work."

Jordan's pre-requirement on its face was so unlimited and absolute in scope—*never* to work on Saturday—that it speaks its own unreasonableness and thus beyond accommodation. This is nonetheless true even though she might have been willing to accept a part-time job, for there emergencies are not inconceivable necessitating work on Saturday. Nor was she content

simply to ask that in emergencies her religious preference be weighed and accorded, if possible. But the bank was unwilling to make a covenant that it could not perform and so create potential liability.

Moreover, the grant of this guarantee to Jordan would obligate the bank to provide it for all of its employees and entail extra expense. This would constitute an "undue hardship", as the Court noted in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. at 84, fn. 15, 97 S.Ct. 2264. As showing bad faith and discrimination by NCNB, Jordan alludes to its employment full-time of one, Elizabeth Woods, also a Seventh Day Adventist, with the promise to accommodate her belief if the need for work on Saturday arose. There is evidence that the same assurances were obtainable by Perry Jordan but she demanded far more. In reiterating her reply to her attorney's question whether Rainey had offered her a job she testified, "Well if I would agree to work on Saturday *sometimes* there was a possibility that he could give me a job." Again she told him, ". . . if there was *any chance* of working on Saturday I couldn't take it." As we have seen, "the only thing that stood between her and employment" was the absolute guarantee—an unjustifiable specification.

On the foregoing grounds we reverse the judgment now on review and enter final judgment for the appellant.

REVERSED WITH FINAL JUDGMENT.

WINTER, Circuit Judge, dissenting:

The majority holds that solely because plaintiff, in seeking reemployment, insisted upon a "guarantee" that she would not be called upon to work on Saturday in derogation of her deeply held and sincere religious beliefs, the Bank was automatically excused from compliance with the Act on the ground that plaintiff's reemployment would constitute "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); 29 C.F.R. § 1605.1(b). I think that the majority misses the real issue in

the case; and when that issue is defined and the record examined, one is inevitably led to conclude that the district court's judgment should be sustained. From a contrary decision, I respectfully dissent.

### I.

There is not any question but that plaintiff, pursuant to her religious beliefs, would absolutely decline to work on Saturday. Her request for a "guarantee" is both an expression of the firmness and sincerity of her beliefs and fair notice to the Bank or any other employer that she could not comply with any order or direction to work on Saturday, lest the Bank or that employer think otherwise.

But this is the beginning of the case, not the solution. It is the premise which invokes the Act and the regulation, for lacking one who has religious beliefs of the unbending nature of those held by plaintiff, neither Congress nor the Commission would have occasion to say that an employer has the duty to accommodate an employee's religious beliefs unless such accommodation would visit "undue hardship on the conduct of the employer's business." The issue here is precisely the same as the issue in the very recent decision in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (June 16, 1977). In that case, a member of the Worldwide Church of God, one of the tenets of which is that one must not work from sunset on Friday until sunset on Saturday, was discharged because he declined to work on Saturday, and he sought injunctive relief. In describing the case for the majority of the Court, Mr. Justice White wrote:

Section 703(a)(1) of the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e–2(a)(1), makes it an unlawful employment practice for an employer to discriminate against an employee or a prospective employee on the basis of his or her religion. At the time of the events involved here, a guideline of the Equal Employment Opportunity Commission (EEOC), 29 C.F.R. § 1605.1(b), required, as the Act itself now does, 42 U.S.C. § 2000e(j), that an employer, short of "undue hardship," make "reasonable accommodations" to the religious needs of its employees. The issue in this case is the extent of the employer's obligation under Title VII to accommodate an employee whose religious beliefs prohibit him from working on Saturdays. 432 U.S. at 66, 97 S.Ct. at 2267.

Then, after summarizing the procedural history of the case and the terms and provisions of the statute and the regulation, Mr. Justice White wrote:

In brief, the employer's statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship, is clear, but the reach of that obligation has never been spelled out by Congress or by Commission guidelines. *With this in mind, we turn to a consideration of whether TWA has met its obligation under Title VII to accommodate the religious observances of its employees.* (Emphasis added.) 432 U.S. at 75,[1] 97 S.Ct. at 2272.

### II.

In deciding the instant case, the district court correctly directed its attention to what, if anything, the Bank had done to determine if there were jobs within the Bank in which plaintiff's religious beliefs could be accommodated. It found that the Bank had done *nothing* to satisfy the Act. The detailed findings of the district court are attached hereto as an appendix to this opinion. From my review of the record, I find them amply supported and *not* "clearly erroneous." Certainly they are not impeached by the fact that plaintiff wanted absolute assurances that her beliefs would

---

1. The Court held that, on the evidence of the alternatives that were available to TWA to enable it to employ the plaintiff and the reasons why TWA rejected each, TWA had satisfied its obligation. The case is completely distinguish-able from the instant one where, as will be shown, the Bank made *no* effort to determine if it could accommodate plaintiff's religious beliefs.

be respected if she were reemployed. Nor are they assailable because the Bank offered her a position on the understanding that it would try to avoid requiring her to work on Saturday. Such an offer withheld the very element that plaintiff's religious beliefs required, and in all honesty, plaintiff could not accept such an offer when she knew that she would not and could not work on Saturday.

The findings need not be restated. It suffices to point out that the district court found that the Bank failed and refused to make any investigation whether or not there was any vacancy in any one of its 1,261 positions in which plaintiff, if qualified and employed, would not be required to work on Saturday without undue hardship to the Bank, or to take any other steps to attempt to accommodate plaintiff's religious beliefs and practices. At the same time, the evidence showed that the Bank was accommodating another employee of plaintiff's faith without any apparent undue hardship to it. These are the operative findings which, to my mind, require affirmance.

### III.

Subsidiary to its condemnation of the "guarantee," the majority asserts that granting it would obligate the Bank to provide it for all of its employees and entail extra expense. This, the majority concludes, would constitute "undue hardship," citing *Trans World Airlines*, 432 U.S. at 84, n.15, 97 S.Ct. 2264.

The record is barren of any evidence to show that, if plaintiff's religious beliefs were accommodated, how many, if any, of the religious beliefs of other employees would require similar accommodation,[2] and what extra expense, if any, to the Bank would be incurred. Since there is no support in the record for the assertion, I must presume that the majority reaches this conclusion as a matter of law (not fact) on its reading of footnote 15 in *Trans World Airlines*. If so, I disagree that footnote 15 may be so read.

The footnote, the text of which appears below,[3] was appended to the statement, "[t]o require TWA to bear more than a *de minimus* cost in order to give Hardison Saturdays off is an undue hardship; " and this statement was made as part of the rejection of the view of the Court of Appeals that the Act required TWA to transfer supervisory personnel or qualified personnel from other departments or to have paid someone premium wages to obtain a person to replace Hardison on Saturday work in order to retain him as an employee. The statement was made in the context of an employer which the district court found "runs a twenty-four-hour-a-day, seven-days-a-week operation." *Hardison v. Trans World Airlines*, 375 F.Supp. 877 (W.D.Mo., 1974). In addition, there was proof both of what TWA had done to accommodate Hardison and what it would cost TWA to provide a Saturday substitute. In this context, there was a factual basis on which the Court could assert that the cost of what was done for Hardison would be magnified by each of TWA's other employees who might have religious scruples against Saturday work. Surely this factual basis is the explanation of footnote 15, for if it is to be presumed as a matter of law that an employer may be required to do for one employee only what it may do for all employees "without undue

---

**2.** So far as the record shows, the Bank has only one employee who is a Seventh Day Adventist. Conceivably, the Bank may have one or more employees who are Orthodox Jews, members of the Worldwide Church of God, or other religious sects proscribing Saturday work, but, if so, the number of such employees is not established.

**3.** 15. The dissent argues that "the cost to TWA of either paying overtime or not replacing respondent would [not] have been more than *de

minimus.*" Post, at 2281 n.6. This ignores, however, the express finding of the District Court that "[b]oth of these solutions would have created an undue burden on the conduct of TWA's business," 375 F.Supp., at 891, and it fails to take account of the likelihood that a company as large as TWA may have many employees whose religious observances, like Hardison's, prohibit them from working on Saturdays or Sundays. 432 U.S. at 84, 97 S.Ct. at 2277.

hardship," no employer would ever be required to accommodate any religious belief of any employee.

To the extent that footnote 15 rests on a factual basis, that basis is lacking in the instant case. The Bank is, with rare exception, only a five-day-a-week operation, and for most employees Saturday is not a normal workday. Any Saturday work for most employees would thus involve extra expense to the Bank. There was no showing that an accommodation of those whose religion prohibited Saturday work could not be made with or without any additional cost to the Bank for the simple reason that the Bank failed to investigate what, if anything, could be done and what the effect on the Bank, if any, would be of accommodating plaintiff. With regard to the number of other employees who would decline Saturday work for religious reasons, the present record reflects that there is only one. As a consequence, I think it incorrect to assert that if plaintiff's religious views were accommodated, the Bank would incur extra expense and that it would be subjected to an "undue hardship."

## APPENDIX

*Pertinent Finding of the District Court*

9. . . . In early May, 1970 the plaintiff went to the offices of NCNB to seek reemployment. At that time, she obtained an interview with Harris A. Rainey, Jr., an employee of NCNB who, at that time, was Employment Manager and who was responsible for hiring clerical employees. . . .

\*　\*　\*　\*　\*　\*

10. Plaintiff, during her initial interview with Mr. Rainey in May, 1970, indicated that she desired any type of work which would not require her to work on Saturday. She indicated that she would be willing to work on Sunday if necessary and that she would further be willing to work overtime at anytime which did not conflict with her Sabbath. She explained to Rainey, however, that her religion absolutely prohibited her from Saturday work at NCNB.

11. Rainey explained to the plaintiff that the Bank could not promise her that she would never have to work on Saturday. Rainey made no efforts to determine if there were jobs within the Bank wherein the plaintiff's religious beliefs could be accommodated. He merely spoke to Mr. Charles Cooley, his superior at the Bank, who reaffirmed Rainey's conclusion that the Bank could not promise (or guarantee) the plaintiff that she would never have to come in on Saturday. Rainey indicated that any job in the Bank might require Saturday work and that the plaintiff would have to be available for Saturday work if, when an emergency occurred, she was called. The plaintiff in her discussions with Rainey, emphasized that her religion absolutely prohibited her from working on her Sabbath and that she could not take a job where her employer would expect her to work on her Sabbath and where she would be required to work and to be available to work on her Sabbath. Rainey understood the plaintiff's beliefs but made no attempts to locate a job for the plaintiff where Saturday work would not be necessary.

12. At trial, Rainey admitted he was not knowledgeable with respect to all the various job functions and duties in all departments at the Bank. He admitted that the front line or department supervisors were much more familiar with the various job requirements in their department and were better qualified to determine whether there were jobs available in their departments for which the plaintiff was qualified and in which she would not have to work on Saturday. No investigation was conducted and no department heads were contacted to ascertain if the plaintiff's religious beliefs could be accommodated. Neither in May, 1970 or thereafter did Rainey speak to any department supervisors or foremen to attempt to find a job where Saturday work could be absolutely excluded. The Court finds that no attempts were made by Rainey or any other Bank officials to attempt to determine if there was a job in the Bank to accommodate the plaintiff's religious practices and beliefs.

13. As of May, 1970 the Bank's entire Equal Employment Opportunity policy was the following brief statement:

## POLICY OF DISCRIMINATION

It has been and will continue to be the Policy of North Carolina National Bank to recruit and hire qualified applicants without regard to race, creed, color, sex, age or national origin; and to treat employees equally with respect to compensation and opportunities for advancement, including upgrading, training, promotion, and transfer.

Bank officials had never formulated or communicated to its personnel supervisory staff any policies with respect to accommodation of the religious beliefs and practices of Bank employees or prospective NCNB employees. There were no written standards with respect to the proper procedures to take to attempt to accommodate religious beliefs, and Mr. Rainey, the Personnel Manager, was not aware of the regulations concerning religious discrimination promulgated prior to 1970 by the Equal Employment Opportunity Commission ("EEOC").

14. As of May 15, 1970 the Bank employed approximately 1243 employees. As of June 15, 1970, the Bank employed approximately 1261 employees. As of May, 1970 and thereafter, there were vacancies at the Bank in jobs for which the plaintiff was qualified. The plaintiff had previously been employed in a Level Three grade job which is a clerical job. The Bank maintains numerous Level Three positions and there are positions at Level Three in most of NCNB's departments.

\* \* \* \* \* \*

16. The great majority of the Bank's operations are not normally in operation on Saturday. For most employees, Saturday is not a normal work day.

17. The Bank, in its various dealings with the plaintiff in May and June, 1970, took no steps to attempt to accommodate the plaintiff's religious beliefs and practices. Specifically, the Bank refused to take any steps to investigate, through inter-office channels, whether or not there were jobs available in various departments in the Bank where the plaintiff would not have to be available for Saturday work and where the plaintiff's religious beliefs could be accommodated. The Bank, by refusing to accommodate the needs of the plaintiff and by refusing to attempt to find a job for her which would not require Saturday work, made clear its policies required that all employees be available to work on Saturday if called.

\* \* \* \* \* \*

20. Elizabeth Woods, A Seventh Day Adventist, testified at the trial. Ms. Woods testified that she began working for NCNB on January 8, 1974. Prior to the time she began working for the Bank, she was interviewed for a job with the defendant by Tom Nicholson, an NCNB employee. After her initial interview with Mr. Nicholson she spoke with the supervisor in the audit department, Ken McReady. When Ms. Woods spoke to McReady, she informed him that she was a Seventh Day Adventist and that, as such, she could not work from sundown Friday until sundown Saturday. She did agree to work overtime on Sunday or during periods other than her Sabbath. McReady informed Ms. Woods that she would not have to work on Saturday and if extra work was necessary over the weekend she could do the work on Sunday. Ms. Woods' position is that she absolutely cannot work on Saturday; the defendant has successfully accommodated her religious needs without a hardship on the Bank. McReady has guaranteed (or promised) Ms. Woods that she will never be asked to work on Saturday and never will have to work on Saturday. Other employees in the audit department do work on Saturday from time to time. In addition, training programs are held on Saturday. Ms. Woods is not required to work on Saturday or to attend any Saturday training programs. She has observed no morale problems in her department because of the accommodations made to her beliefs and, to the best of her knowledge, there have been no complaints concerning the fact that NCNB has accommodated her religious beliefs.

21. The defendant's position that accommodation of plaintiff's religious beliefs would result in business hardships to NCNB with respect to employee relations, morale, personnel management, discipline and uniformity of policy is not demonstrated by the evidence. Indeed, the religious needs of Elizabeth Woods, a Seventh Day Adventist who has worked and is now working for the Bank, have been met with no hardship to the defendant. There is simply no evidence that morale will suffer or that disciplinary problems would be created if the plaintiff's religious needs had been or are now accommodated. In fact, all the evidence is to the contrary.