**Emmit W. PADON, Plaintiff,**

**v.**

**H. Russell WHITE and the Richmond State School, etc., Defendants.**

**Civ. A. No. 75–H–812.**

United States District Court,
S. D. Texas,
Houston Division.

Feb. 14, 1979.

Charles E. DeWitt, Jr., Houston, Tex., for plaintiff.

Douglas B. Owen, Asst. Atty. Gen., Austin, Tex., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

COWAN, District Judge.

*Issue and Holding*

■ The essential issue in this case is whether the defendants have made reasonable efforts to accommodate their operations to the plaintiff's religious beliefs. The court has concluded that the defendants have not made such reasonable effort and have thus violated the law. The findings of fact and conclusions of law which support this conclusion are set out herein.

*Basic Factual Background*

Richmond State School (hereinafter "RSS") is a state institution which houses a large population of severely retarded individuals who require constant care and supervision because they do not possess the mental ability to recognize danger. The residents of the institution must be supervised on a 24-hour, seven-day a week basis. The institution provides care for hundreds of patients.

RSS covers an extended geographical area, which contains numerous buildings. The school has an extensive maintenance staff, including two plumbers, an electrician, an air-conditioning and refrigeration specialist, carpenters, painters, maintenance pool mechanics, power plant specialists and laborers. The principal supervisory personnel in the maintenance department are the Plant Engineer, who is basically the head of the maintenance department, and his number one assistant, who is designated a "Maintenance Foreman."

While the staff of RSS is extensive, the "administration" of the school basically consists of five key persons: Superintendent, Assistant Superintendent, Business Manager, Plant Engineer and Medical Director. At the time of Emmit W. Padon's discharge, which the court here finds to be inconsistent with the obligations of law, the Superintendent was H. Russell White; the Assistant Superintendent was R. Allen Williams; the Business Manager was Dan P. Dennis; and the Plant Engineer prior to his discharge, was the plaintiff herein, Emmit W. Padon. All of these supervisory personnel have testified, either in person or by deposition, and their testimony is analyzed herein.

Emmit W. Padon (hereinafter "Padon") is a dedicated Seventh Day Adventist. He has been a practicing member of this church for many years and has never concealed or made any secret of his religious affiliation. Padon is also a talented maintenance superintendent. Padon originally was a plumber, later an independent contractor in the construction business, later the head of maintenance at a hospital operated by his church, and in November of 1967, he went to work for RSS as the Maintenance Foreman. While the Maintenance Foreman is in fact a foreman, he is really the number two man in the maintenance department and the principal assistant for the Plant Engineer. RSS was, in the judgment of the court, extremely fortunate to employ Padon. Padon is obviously, as the court analyzes his character, a dedicated, conscientious, hard-working individual completely willing to make any reasonable accommodation to the demands of his job. He is not, in the court's judgment, an "8:00 to 5:00" man but is an individual who is perfectly willing to work whatever hours are necessary to accomplish his mission. As are all Seventh Day Adventists, Padon is a dedicated Sabbatarian. As demonstrated by his testimony and by specific instances in the testimony, Padon is perfectly willing to perform Saturday work if necessary to preserve life, health or property; however, he steadfastly refuses to do routine work, work which could easily be delegated to others, or work which could reasonably be postponed from sundown on Friday to sundown on Saturday. RSS contends that Mr. Padon has not at all times been candid and open about his Sabbatarian views; but the court specifically holds that this factual assertion by RSS is totally unsupported by the record.

At the time of his employment in November of 1967, Padon was, in effect, the number two man in the maintenance department. His immediate supervisor was Joe L. Waldron, the Plant Engineer. Mr. Waldron has testified that at the time of his employment he was told that the Plant Engineer was expected to be "on call" seven days a week for emergencies. Waldron was not told that he was expected to work seven days a week. Waldron interviewed Padon at the time of his employment. Padon told Waldron that he was a Seventh Day Adventist, and except in the event of an emergency threatening life, health or property, he would be unable to perform routine work on Saturdays. Waldron advised Padon that this was a very satisfactory arrangement because he, Padon, could take maintenance calls and attend to difficulties on Sundays, and Waldron would take calls and attend to any emergencies on Saturdays. Waldron also testified that he discussed Padon's religious affiliation and his Sabbatarian beliefs with the then Business Manager, Mr. Cobb. The Plant Engineer, as indicated above, reports to the Business Manager.

After his employment and for over five years, Padon's religious beliefs caused no difficulties. On a number of occasions, emergencies did occur which required his presence at the school on Saturdays, and he willingly appeared and did his work. For example, on one occasion, an inmate mounted a tow-motor and damaged a number of visitor's cars. Padon came to the plant, pacified the owners of the cars and dealt with the situation.

It is undisputed that at the time of Padon's employment as Maintenance Foreman, Waldron, then Plant Engineer, advised the then Business Manager (Cobb) of Padon Sabbatarian commitment. Cobb was later replaced by D. P. Dennis, the official primarily responsible for Padon's discharge. A number of events occurred after Dennis became Business Manager which placed Dennis on complete notice of Padon's Sabbatarian views. Social events, which related to the business of the school, occurred with some frequency on Friday nights, and Padon, to Dennis' knowledge, refused to attend. In addition, on one occasion certain officials from Austin were to visit Richmond State School on Saturday to conduct a meeting or seminar of some description. Padon refused to attend. Dennis and Padon had some words about this, and Dennis told Padon that "the man" (whoever the man was) would not appreciate Padon's ab-

sence. Nevertheless Padon regarded this meeting as being essentially not an emergency, and refused to attend.

On another occasion, around Christmas, a machine which Padon had built for the purpose of decorating light poles at Christmastime broke down about Saturday noon. Dennis called Padon at home and Padon advised Dennis that he would be glad to come out to the school after sundown and repair the machine. On that occasion, Dennis told Padon not to worry about the matter, that an alternate method of dealing with the problem would be found.

Some years after Padon had begun work as a Maintenance Foreman, the job of Plant Engineer became available. Padon did not apply for or solicit the job. Dennis approached Padon and asked Padon if he was interested in becoming Plant Engineer and explained to him the salary and the position. Padon's initial response was that the difference in salary was not sufficient to justify the additional responsibility. Dennis then reminded Padon that the Plant Engineer, as was the case of the Superintendent, Assistant Superintendent, Business Manager and Medical Director, received either a house on the premises or a "housing allowance." After being advised of the housing allowance, Padon accepted the job and performed it to the complete satisfaction of the administration of RSS until the "bathhouse incident" of June 1973 which resulted in Padon's discharge.

RSS contends that once a "key official" agrees to accept a "housing allowance," he in effect agrees to be available and at the unfettered beck and call of his supervisors seven days a week, 24 hours a day. The evidence, however, simply does not support this conclusion. As is the case in any large and relatively well run organization, RSS has been organized so that the people at the top, although conducting demanding jobs, can live normal lives. Members of the "administration" worked from 8:00 a. m. to 5:00 p. m., like other employees. Periodically they served on rotating duty known as "officer of the day." The officer of the day is on duty after hours and on holidays,

accepts calls and deals with situations, and in the event of an emergency with which he cannot deal, calls upon some member of the administration to assist him. There is no requirement that a person who receives the housing allowance be available totally at the beck and call of his supervisors 24 hours a day, seven days a week; and in fact, it is readily apparent to the court that the housing allowance is primarily a legal and completely proper method by which the State of Texas is able to give certain of its key employees some arguably tax-free income.

RSS received a donation from the Moody Foundation to construct a swimming pool. Construction of the swimming pool consumed all of the Foundation grant, and the administrators of RSS discovered, after the construction of the pool, that they needed a bathhouse for the residents of RSS to change their clothes before and after using the swimming pool. Mr. Padon suggested that if donations of materials and some labor could be obtained from businesses and unions in the community, he, along with members of his maintenance staff, could perform the plumbing and electrical work to complete the bathhouse. Accordingly, charitable businessmen donated materials and a local chapter of the bricklayers' union agreed to provide the labor of laying the bricks. The bricklayers, however, could work only on Saturday, and this situation gave rise to what eventually became a confrontation between Business Manager Dennis and Padon.

When he became Plant Engineer, Padon had as his principal assistant (whose title was Maintenance Foreman) Samuel J. King. Padon had worked out much the same arrangement with King that he had earlier had with Waldron, i. e., King would be available to deal with maintenance problems on Saturdays, and Padon would be available to deal with maintenance problems on Sundays. King was a recent widower and advised Padon that he would be very happy to do whatever was necessary in connection with the bricklayers' work on Saturdays because Saturdays were extremely lonely days for him and he was

glad to have some activity to take his mind away from his recent tragedy. It is undisputed in this record that King never complained about doing this temporary work on Saturdays during the construction of the bathhouse. Despite the fact that King never complained, Dennis and Williams, the Assistant Superintendent, attempt to justify their hard line attitude with Padon by testifying that they were worried about King's morale and the "morale" of other employees because of Padon's "special privileges." Frankly, this testimony simply does not ring true and appears to the court to be a retrospective effort to justify a wrongful discharge.

On each Friday before the bricklayers would come to work, Padon would confer with the bricklayers' business agent and outline the work to be done. King would then be present on Saturday primarily for the purpose of making certain that the bricklayers did not lay bricks in some area where electrical conduits or plumbing connections would later be required.

The "bathhouse project" was a temporary matter involving at the most only a few Saturdays' work. Dennis and Williams donated their labor and worked with the bricklayers voluntarily on Saturdays. As this court analyzes the situation, what really occurred in this situation was that Dennis and Williams became angry at Padon because he was not participating in the Saturday work, and this very human situation degenerated into a confrontation rather than a cooperative effort to solve a problem.

After about three Saturdays, King, the Maintenance Foreman and Padon's first assistant, wanted a Saturday off. Dennis, after unsuccessful efforts to persuade Padon to work, issued to him a direct order to report to work on Saturday. Padon declined on the grounds that the work was not an emergency but was essentially routine, and that any one of a number of persons could perform the work of watching the bricklayers and making certain that they did not place bricks in some location where, at a later point, an electrical connec-

tion or a plumbing fixture would be required. This court believes that Padon's position was eminently reasonable. The maintenance staff had 45 to 50 people, a number of whom were highly skilled persons such as plumbers, electricians, and air-conditioning specialists. While there is no direct evidence of this fact, the court is persuaded that any one of these highly skilled individuals could have performed the work of watching the bricklayers and making certain that they did not brick-in an electrical connection on a Saturday morning.

In fact, when Padon refused to appear, the school was able to obtain, without charge, a consultant, a man working on other construction in the plant, to fill in on Saturday to perform the work which Dennis was insisting that Padon perform.

The bathhouse was ultimately completed without difficulty, and RSS has admitted that Padon's refusal to come to the school and work on the bathhouse on Saturdays did not delay or impede the completion of the work. In fact, RSS has admitted in answers to interrogatories that this particular episode did not cause undue hardship on RSS.

At trial, RSS argued, through its witnesses, that this refusal of Padon to work on Saturdays did imperil the health and safety of the inmates because an inmate might have wandered into the pool and drowned. It was not Padon's job, however, to supervise the physical movements of the inmates and to provide physical security or to perform the work of a guard.

This unfortunate situation simply, as the court views the matter, developed into a contest of wills between Mr. Dennis and Mr. Padon. Dennis apparently considered it an affront to his authority when Padon refused to work on Saturday and reserved to himself the decision of when Saturday work was essential. Padon was discharged.

Thereafter, after seeking legal counsel, RSS had second thoughts about whether or not its actions were legally justifiable, and a meeting occurred in August 1973 attended by Mr. White, Superintendent of RSS;

Williams, Assistant Superintendent; Dennis, the Business Manager; Glenn Thomas Carter, an attorney representing Mr. Padon; Don Sullivan, Director of Public Relations, and Mr. Padon. At this meeting White stated that: "Our chief of legal services doesn't feel comfortable at all that we can prove undue hardship on this specific Saturday for the assignment that Emmit got . . . ." By August, however, RSS had placed itself in a difficult position because Mr. Padon had been replaced as Plant Engineer by another man, Mr. Newman. RSS, therefore, could not gracefully reinstate Padon without displacing Newman. RSS had, however, two budgeted positions for Maintenance Foreman and offered Padon reemployment as a Maintenance Foreman. Padon, after some deliberation, accepted this demotion under protest, having written a letter preserving all of his legal rights.

Padon has continued to work as a Maintenance Foreman for RSS up to the present date and therefore he has substantially over 11 years as an employee of RSS, either as Maintenance Foreman or Plant Engineer. It is highly significant that the only occasion on which his Sabbatarian convictions have caused any difficulty whatsoever at Richmond State School has been at the time of the "bathhouse incident." The court concludes that the difficulty of the bathhouse incident did not occur because of Padon's Sabbatarian convictions but because Dennis apparently regarded Padon's Sabbatarian principles as a challenge to his authority and refused to make any effort whatsoever to accommodate the demands to Padon's religious convictions. During this 11-year period Padon has always been available on Saturday for anything which even hinted at an emergency. For example, he has made himself available to solve the problems relating to the property damage to visitor's vehicles. He has visited the plant on Saturdays to correct plumbing problems which threatened property damage. He has never refused a Saturday call to deal with anything which was even close to a genuine emergency. His only offense was to refuse to knuckle under to Mr. Dennis' unreasonable demands. Dennis and his supervisor made absolutely no effort to accommodate Padon's religious beliefs in connection with the "bathhouse incident." This refusal to accommodate resulted in Padon's termination, his ultimate demotion and thus was totally inconsistent with the law as discussed below.

*The Applicable Law*

Title VII of the Civil Rights Act of 1964, Public Law 88–352, codified at 42 U.S.C. § 2000e–2(a)(1) states simply that:

> It shall be an unlawful employment practice for an employer—(1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion.

The 1972 amendments to the Civil Rights Act of 1964 states:

> The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j).

The Supreme Court has recently explained that: "The intent and effect of this definition was to make it an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 2271, 53 L.Ed.2d 113 (1977).

█ The Supreme Court and the Courts of Appeal have made it clear that an employer has an affirmative obligation under Title VII to attempt to accommodate his operations to his employee's religious beliefs. An employer may demonstrate that he has complied with his legal obligation by showing any additional accommodation

would involve "undue hardship." In short, the inquiries are: What accommodation is "reasonable"? What hardship is "undue"?

*Hardison* is distinguishable from the case at bar in two principle respects:

1. The key employees of RSS were a small, relatively close-knit group in which accommodation, assuming good faith and an effort to accommodate, would be simple;

2. The situation in Padon was in many respects, a "one shot"—not a recurring constant situation. Obviously it is much easier to accommodate and make arrangements for a temporary situation than it is for a semi-permanent or permanent situation such as was involved in *Hardison;*

3. The employer in *Hardison* did, as demonstrated below, make extensive efforts to accommodate. In this particular situation, in connection with the confrontation that led to Mr. Padon's discharge and ultimate demotion, RSS made no good faith efforts to accommodate its needs to Padon's religious beliefs.

 It is clear from *Hardison* that an employer need not accommodate religious practices which would cause the employer to incur more than de minimis costs. *Hardison, supra,* at 2277. More important, an employer is not required, in order to demonstrate undue hardship, to alter a bona fide seniority system established by a collective bargaining agreement. The employer in *Hardison* had made strenuous efforts ·to accommodate Hardison's religious beliefs, and the only alternative left was modification of a bona fide collective bargaining agreement which was the result of strenuous long-term negotiations and involved hundreds, if not thousands, of employees.

In *Hardison,* TWA had held several meetings with the employee in an attempt to resolve his conflict by attempting to work out some type of change, authorized a search for an employee to swap shifts with the plaintiff, had attempted to find Hardison another job within the TWA organization in which he would not be required to work on Saturdays, and had reduced TWA's work force to a minimum on weekends. 97 S.Ct. at 2273–74. RSS in the case at bar, at least with reference to the "bathhouse incident" made no comparable efforts.

The facts here are totally distinguishable from those in *Jordan v. North Carolina National Bank,* 565 F.2d 72 (4th Cir. 1977). In that case the job applicant insisted upon an ironclad "guarantee" that she would not be called upon to work on Saturdays as a requisite of her duties. Padon had never demanded such a "guarantee," but in fact over a period of almost 12 years has demonstrated a consistent willingness to work on Saturdays where it is really necessary.

Similarly, *Johnson v. United States Postal Service,* 497 F.2d 128 (5th Cir. 1974); *Williams v. Southern Union Gas Co.,* 529 F.2d 483 (10th Cir. 1976); *Rohr v. Western Electric Co.,* 567 F.2d 829 (8th Cir. 1977); *Chrysler Corporation v. Mann,* 561 F.2d 1282 (8th Cir. 1977); *Reid v. Memphis Publishing Company,* 521 F.2d 512 (6th Cir. 1975) are readily distinguishable.

Each of the cases in this area of the law must in effect stand on its own feet. No cases will be located which are completely identical to one another on the facts. The undersigned is persuaded, however, that the court's decision in this case is supported by the following authorities: *Anderson v. General Dynamics,* 589 F.2d 397 (9th Cir. 1978); *Burns v. Southern Pacific Transp. Co.,* 589 F.2d 403 (9th Cir. 1978); *Draper v. United States Pipe & Foundry Co.,* 527 F.2d 515 (6th Cir. 1976).

## Specific Findings of Fact and Conclusions of Law

In addition to the general statement of the facts, as this court perceives them, above, the court makes the following specific findings of fact and conclusions of law relating to this case:

1. RSS, in connection with the termination and demotion of Padon, did not make an effort to make reasonable accommodations to Padon's religious beliefs and practices.

2. RSS, in connection with the circumstances relating to Padon's termination and demotion, could have accommodated its operations and its demands, without undue hardship, to Padon's religious beliefs.

3. In connection with Padon's termination and demotion, RSS made no good faith efforts to accommodate its operations to Padon's religious beliefs.

*Further Proceedings*

The question of liability in this case was bifurcated from the question of damages. If the parties cannot agree on appropriate relief, the court will conduct a hearing on the 7th day of March, 1979, at 5:00 p. m., for the purpose of allowing the parties to present evidence and make arguments concerning appropriate relief in this case.