**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant,**

v.

**ITHACA INDUSTRIES, INC., Defendant-Appellee.**

No. 87–2526.

United States Court of Appeals, Fourth Circuit.

Argued July 9, 1987.

Decided Sept. 24, 1987.

Rehearing En Banc Granted Nov. 25, 1987.

Warren Bo Duplinsky, Washington, D.C., for plaintiff-appellant.

Robert O. King, Greenville, S.C., for defendant-appellee.

Before HALL and WILKINS, Circuit Judges, and ANDERSON, District Judge for the District of South Carolina, sitting by designation.

GEORGE ROSS ANDERSON, Jr., District Judge:

The EEOC initiated this action under Title VII of the Civil Rights Act[1] on behalf of Daniel Dean for alleged wrongful discharge resulting from his refusal to work on his sabbath (Sunday). The district court entered judgment for the defendant employer, Ithaca Industries, Inc. (Ithaca). Finding the decision of the district court not "clearly erroneous," we affirm. *Anderson v. Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

Ithaca is a textile manufacturing plant located in Gastonia, North Carolina. There were twelve other plants in the network, all dependent upon the Gastonia plant for their finished raw materials. The Gastonia plant served as the finishing plant for the other twelve plants. If Gastonia did not timely produce fabric for the other plants, one or more would have to close.

Historically, the Gastonia plant did not operate on Sundays, however, in early 1984 product demand became so great it was essential that they resort to limited operations on Sunday. In fact, Dean had been employed at the Gastonia facility since 1979 and had never been asked to work on Sunday until January 22, 1984.

During the relevant time period we are concerned with only four Sundays, to wit: January 22, February 19, March 18 and April 1, 1984.

Dean was requested to work on Sunday, January 22, 1984 and on February 18, 1984 but he refused stating he was expecting out-of-town guests and that he had already made other plans. On neither occasion did he base his refusal on religious grounds. He was not disciplined on either occasion for his refusals.

On Friday, March 16, 1984 Dean failed to appear for his shift as scheduled. This absence precipitated a written warning regarding Dean's chronic absenteeism in the form of an Employee Relations Report which provided that:

> Employee has been out 8 days this year. He has been told this must improve if he is to remain at Ithaca.

> Employee has poor attitude which has been covered.

Dean refused to sign this report even after a prolonged conference with his supervisor.

It was not until March 18, 1984 that Dean refused Sunday work based on religious reasons. When he reported to work on Monday, March 19, 1984 he received

---

1. Title 42 *U.S.C.* § 2000e–2(a) provides:
   It shall be unlawful for an employer—(1) to ... discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because* (emphasis added) of such individual's ... religion....
   Title 42 *U.S.C.* § 2000e(j) provides:

   The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to *reasonably* (emphasis added) accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

another written warning which read in part:

Employee has 9 absences and 1 unexcused absence. Another unexcused absence will result in termination.

Again, Dean refused to sign the Employee Relations Report after a full explanation from his supervisor. These facts indicate that his employment career was somewhat less than impressive.

When requested to work on April 1, 1984 he flatly refused reasoning that he was not working for anyone on Sunday because of his religious beliefs. He was discharged on Monday, April 2, 1984.

Ithaca's policy on Sunday work was non-discriminatory. Shift supervisors first sought volunteers. If a sufficient work force could not be recruited on a volunteer basis, the shift supervisor designated particular employees. In selecting Sunday workers the supervisor took into consideration whether or not an employee had worked on previous Sundays, how many hours had been worked during the week and the qualifications of the employee for the particular job.

Each shift was responsible for obtaining their Sunday workers, hence, they were not recruited from other shifts.

Dean conceded he was not treated any differently from other employees on his shift.

The posture of Dean's refusal to work on Sunday is more aptly reflected in his testimony at trial:

Q. In other words, you would have to be guaranteed that your job would not require Sunday work?
A. Yes.

Dean also testified he was willing to work with management and his fellow employees on every issue except Sunday work and that he could not compromise on the Sunday work question.

Given this factual scenario we must decide if Ithaca (1) discriminated against Dean because of his religion and (2) failed to reasonably accommodate his religious observance or practice without undue hardship on the conduct of Ithaca's business.

Assuming arguendo that Dean established a *prima facie* case of discharge for religious reasons, the next inquiry is did Ithaca demonstrate any effort to reasonably accommodate his religious observance or practice.

In an effort to accommodate the religious practices of Dean and its other employees, Ithaca personnel supervisors took the following steps: employ the minimum work force possible to maintain production on Sundays; attempt to fill skeleton work crews first with volunteers; and select additional workers on a rotating basis with additional safety considerations.

After implementing this policy Ithaca faced a Hobson's choice when confronted with Dean's uncompromising and adamant refusal to work on Sunday. Ithaca could either totally capitulate to Dean's demands and require other employees to perform his work or replace Dean with an employee willing to make reciprocal accommodations. This choice would compel Ithaca to openly discriminate against other workers.

Dean's uncompromising attitude and his desire for a guarantee for no Sunday work boxed Ithaca into a corner. Nothing they could do, except unconditionally surrender to his demands, would suffice.

The district court recognized the statutory meaning of "reasonable accommodation" and the corresponding burdens.

[T]he statute's use of the term "reasonable" suggests: bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business. Although the statutory burden to accommodate rests with the employer, the employee has a correlative duty to make a good faith attempt to satisfy his needs through means offered by the employer.

*Brener v. Diagnostic Center Hospital,* 671 F.2d 141, 145–146 (5th Cir.1982).

Throughout his testimony, Dean refused to compromise in any way on the Sunday work issue. He never offered to work on Sunday if he would be allowed to attend church services. The district court judge

found that "he just would not work on Sunday, period." (Transcript at p. 14, para. 34). By his own absolutist position, Dean precluded Ithaca from making a reasonable accommodation for his religious practices.

This Court has previously faced the refusal to work on sabbath conflict. In *Jordan v. North Carolina National Bank*, 565 F.2d 72 (4th Cir.1977) (Rehearing and Rehearing *en banc* denied), a qualified applicant with a sound work record sought re-employment by the bank. However, as a precondition to her employment, Jordan demanded an unrestricted guarantee that she would never be asked to work between sundown Friday and sundown Saturday, her Sabbath. The bank could not make this guarantee and refused to hire Jordan. This Court reversed the district judge's religious discrimination finding and stated:

> Jordan's pre-requirement on its face was so unlimited and absolute in scope—never to work on Saturday—that it speaks its own unreasonableness and thus beyond accommodation.

*Jordan, supra,* 565 F.2d at 76.

The circumstances in the instant case provide even more justification for Ithaca's response to the conflict than existed in *Jordan*. First, there is no indication in *Jordan* that the bank attempted to accommodate the applicant by soliciting a pool of stand-by volunteers for potential work on Saturday. Ithaca did in fact make efforts to accommodate Dean's religious practices. Secondly, the conflict in *Jordan* was merely anticipated. However, in the instant case the conflict manifested itself into a very real and immediate impasse. The Gastonia plant provided all of the raw material to Ithaca's finishing plants. The continued operation of several plants depended upon the steady flow of material from the Gastonia plant. Lastly, in *Jordan* the applicant presented a good employment

record in her previous position with the bank. In sharp contrast, Dean did not possess a sound work record. During the course of his employment with Ithaca, Dean received written and verbal reprimands for his absenteeism and his cooperation with others. The district court judge's findings recognize Ithaca's dissatisfaction with Dean's performance. Therefore,, the holding of *Jordan* applies to this case with even greater force.

EEOC argues we should interpret "reasonable accommodation" in accordance with their own guidelines.[2] We decline to adopt such a construction. The Supreme Court recently reaffirmed proper deference to these regulations in *Ansonia Board of Education v. Philbrook*, — U.S. —, 107 S.Ct. 367, fn. 6, 372, 93 L.Ed.2d 305 (1986), *citing also General Electric Co. v. Gilbert*, 429 U.S. 125, 141, 97 S.Ct. 401, 410, 50 L.Ed.2d 343 (1976).

We have, of course, noted that EEOC guidelines are properly accorded less weight than administrative regulations declared by Congress to have the force of law.

▮ EEOC suggests that Ithaca could have compelled other shift employees to work for Dean; they could have required other employees to work a double shift and they could have located workers on a different shift to perform his duties.

We disagree with these suggested alternatives. The statute is not to be construed to require an employer to discriminate against some employees in order for others to observe their sabbath. Such a discriminatory construction would do violence to the very problem it was designed to correct.

As we have seen, the paramount concern of Congress in enacting Title VII was the elimination of discrimination in employment. In the absence of clear statutory language or legislative history to the

---

**2.** EEOC Guidelines Section 1605.2(c)(1) provides:

> After an employee or prospective employee notifies the employer or labor organization of his or her need for a religious accommodation, the employer or labor organization has an obligation to *reasonably* (emphasis added)

accommodate the individual's religious practices. A refusal to accommodate is justified only when an employer or labor organization can demonstrate that an undue hardship would in fact result from each available alternative method of accommodation. . . .

contrary, we will not readily construe the statute to require an employer to discriminate against some employees in order to enable others to observe their Sabbath. *TransWorld Airlines, Inc. v. Hardison*, 432 U.S. 63, 85, 97 S.Ct. 2264, 2277, 53 L.Ed.2d 113, 131.

Ithaca also contends that the "reasonable accommodation" to an employee's religious belief violates the First Amendment. In view of our conclusion we need not consider this issue.

AFFIRMED

WILKINS, Circuit Judge, concurring:

Our result is compelled by *Jordan v. North Carolina National Bank*, 565 F.2d 72 (4th Cir.1977). In cases where reasonable accommodation with an "absolute" demand by an employee may not be reached "without undue hardship," *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 72, 97 S.Ct. 2264, 2271, 53 L.Ed.2d 113 (1977), such a demand "speaks its own unreasonableness and [is] thus beyond accommodation." *Jordan*, 565 F.2d at 76.

The dissent contends that *Jordan* is distinguishable because there "the employer did make *some* effort to accommodate the prospective employee." (Emphasis added.) But, in this case, the record shows more efforts by the employer to accommodate the employee's religious beliefs than those evidenced in *Jordan*. In *Jordan*, a prospective employee explained to the company's personnel interviewer that she "would not work on Saturdays [her Sabbath]," *id.* at 74, and she would not accept a job unless she received a "guarantee" that she would not be asked to work on Saturdays. *Id.* at 75. The employer responded that "we would certainly try to accommodate . . . but we couldn't give her a formal binding guarantee." *Id.* The only other effort by the employer to accommodate was an apparent offer, rejected by the employee, of work on a "trial basis, to ascertain if actually there was a problem of work on her Sabbath." *Id.* at 76.

Here, the employee (Dean) "just couldn't compromise on the Sunday work question," declaring "I just don't work on Sundays. It's against what I believe in." These views were purely personal to Dean at the time of his refusal to work, rather than a reflection of adherence to the specific teachings of his church.

It is undisputed that during the course of most of Dean's tenure with his employer, Sunday labor was not requested. However, in 1984 increased production demand required operation of the plant six to seven days per week. When work on Sunday was necessary the supervisors initially asked for volunteers. If there were not enough volunteers, employees were detailed to work on Sunday. Dean was requested to work on Sunday on four occasions between January 22 and April 1. He refused on each occasion. On these occasions other employees were detailed to work in his place, and on one occasion his supervisor filled in for him.

The record is clear that the employer attempted within reason and in good faith to accommodate Dean. The dates in issue standing alone provide a reasonable inference that the supervisor requested Sunday work on a rotation basis, asking Dean's assistance only once per month and requiring it of another employee when Dean refused. Only when it became evident that Dean would not compromise in any manner, after other employees had complained of his preferential treatment, after the last of four requests was made, and after Dean again refused to work on Sunday, did termination result. The employer's efforts at accommodation were sufficient when confronted by an absolute and uncompromising position by the employee.

K.K. HALL, Circuit Judge, dissenting:

I cannot agree with the majority's conclusion that Ithaca made adequate efforts to reasonably accommodate Dean's religious practices. For this reason, I respectfully dissent.

The majority takes the position that an employee who refuses to work on his Sabbath is being unreasonable, thereby relieving the employer of any further duty to accommodate his religious belief. In my view, the Civil Rights Act assumes that

certain employees will not work on their Sabbath for any reason. Moreover, the Act clearly places the burden on employers to make some effort to reasonably accommodate an individual's religious practice. I can see no indication that Ithaca made any effort at all to accommodate Dean. It is true that Ithaca did demonstrate an effort to accommodate *all* their employees when Sunday work was assigned.[1] These accommodations, however, were clearly not for religious reasons. In addition, Ithaca made no effort to accommodate Dean by any of the methods suggested by the guidelines in the regulations.[2]   20 C.F.R. § 1605.-2(d)(1)(i).

The majority relies on *Jordan v. North Carolina National Bank*, 565 F.2d 72 (4th Cir.1977) to support its holding that there can be no reasonable accommodation for Dean's absolute refusal to work on Sunday. However, in *Jordan*, the employer did make some effort to accommodate the prospective employee and was in fact accommodating another employee who refused to work on her Sabbath. The majority's reliance on *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), is similarly misplaced. In *Trans World*, the employer had looked at all the alternatives available to enable it to accommodate the employee and gave the reasons why it rejected them. It thereby satisfied its statutory obligation. In this case, Ithaca made absolutely no effort at accommodation.

In my view, Dean presented a valid religious reason why he could not work on Sunday (which Ithaca acknowledged was for religious reasons), Ithaca then violated the Civil Rights Act by its failure to attempt to reasonably accommodate Dean's religious practices.

---

1. According to testimony elicited at the trial, supervisors made an effort to be fair to all employees when assigning Sunday work because none of the employees wanted to work on Sundays.

2. The regulations set out the following as examples of some means of accommodating religious

For the foregoing reasons, I would reverse the judgment of the district court.

practices: (a) the use of voluntary substitutes with substantially similar qualifications by publicizing policies, promoting an atmosphere in which substitutions are favorably regarded and providing a central file or bulletin board for matching substitutes; and (b) flexible scheduling by means of floating or optional holidays.