**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**CARIBE HILTON INTERNATIONAL and Union De Tronquistas De Puerto Rico, Local 901, Defendants.**

**Civ. No. 84–1639 GG.**

United States District Court, D. Puerto Rico.

Oct. 25, 1984.

David Ingram, E.E.O.C., New York City, Francisco Besosa, Asst. U.S. Atty., San Juan, P.R., for plaintiff.

Francisco M. Ramirez Rivera, Manuel A. Quilichini, Lespier, Muñoz, Noya & Ramirez, San Juan, P.R., for Caribe Hilton Intern.

Pedro J. Varela, Hato Rey, P.R., for Union De Tronquistas De Puerto Rico, Local 901.

## OPINION AND ORDER

GIERBOLINI, District Judge.

This is an action brought by plaintiff, Equal Employment Opportunity Commission (EEOC), under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, against defendants, Caribe Hilton International (Hilton) and Unión de Tronquistas de Puerto Rico, Local 901 (Local 901), charging them with unlawful religious discrimination against Félix Vélez Cruz (Vélez).

### I—FACTUAL BACKGROUND

On June 22, 1984, plaintiff filed a verified complaint and a motion requesting this court to issue a temporary restraining order. Upon these documents and exhibits attached thereto, and upon a chambers conference held on June 25, 1984, attended by plaintiff and co-defendant Hilton, the court ordered Hilton to reinstate Vélez to his employment forthwith. A hearing to consider the motion for preliminary injunction was set for July 3, 1984 at 9:30 a.m. Upon a joint motion filed by the parties, plaintiff's requests for preliminary and permanent injunctions were consolidated and the hearing set for July 3 was continued until the date of trial, August 8, 1984.

From the evidence presented and testimony heard during the trial, it appears that Vélez is a practicing Seventh-Day Adventist. As such, he is required to observe the Sabbath (i.e. he cannot work from sunset Friday until sunset Saturday). Vélez was first employed by Hilton in 1972 as a security supervisor. He informed his immediate supervisor of his religious beliefs. Consequently, he was given Fridays off. Thereafter, in 1974, Vélez was transferred to the casino department as a doorman. He was assigned to a permanent night shift with Thursdays and Fridays off. This situation remained unchanged until 1982 when a new collective bargaining agreement came into effect.

Pursuant to the provisions of the new agreement, a work year is divided into two stages. The first stage commences on December 16 and concludes on April 15. During this period, a work week consists of five consecutive working days and two days off. The second stage which runs from April 16 until December 15 creates a week of four consecutive working days and two days off. Due to the rotational nature of the four-day week, Vélez would inevitably be scheduled to work on Fridays.

The adoption of the four-day week was the central issue of the bargaining negotiations and, as such, was widely publicized. The new collective bargaining agreement was finally approved on February 15, 1982. Hilton consented to the inclusion of the four-day-week clause in order to avoid an impending strike.

In view of the establishment of the four-day week, Vélez and the other doormen Jorge Tapia (Tapia) and Rubén Velázquez (Velázquez) arranged to alternate shifts whenever Vélez was scheduled to work on Friday night. The Hilton management was notified of this arrangement for its approval. This arrangement, however, became an inconvenience to Tapia and Velázquez, particularly the latter since he had to work two consecutive shifts. As a result, Vélez could not obtain a replacement for Friday, July 1, 1983. He did not report to work on that day and was consequently suspended for fifteen days.[1] Vélez then filed his complaint of employment discrimination with the United States Department of Labor which in turn transferred it to the EEOC.

Shortly thereafter, the EEOC and Hilton commenced the conciliation process. During this time, although Vélez remained scheduled to work on Fridays, no disciplinary measures were taken against him for not reporting to work because all parties expected to reach a permanent agreement. In fact, a tentative agreement was reached whereby the three doormen would be excluded from the provisions of the collective bargaining contract establishing the four-day week. However, after consultation with the other doormen, Local 901 later rejected said proposal. All expectations of reaching a joint resolution were terminated. During the conciliation process Hilton covered Vélez' shift by assigning either a security guard or Velázquez to work several hours of overtime.

As a result of the unsuccessful conciliating efforts, on April 26, 1984, Pedro Díaz (Díaz), Hilton's Personnel Manager, informed Vélez that all efforts to accommodate him had failed and that any further absences would result in disciplinary measures. Díaz also invited Vélez to meet with him and seek a resolution to the conflict. However, Vélez responded by refusing to work on Friday, May 11, 1984 or any other Friday. He was admonished by letter dated May 18 because of his absence on May 11 and was further warned that any subsequent absences would result in his dismissal.

---

1. After his suspension, Vélez was scheduled to report to work on Friday, July 29, 1983, but he failed to do so and was again suspended. It must be noted that the evidence regarding this suspension is unclear. While Vélez testified that Julio Cora, the Casino Manager orally suspended him, the hotel's records did not reflect said suspension. Furthermore, we take this opportunity to note that Vélez' testimony was impregnated with inconsistencies, contradictions, selective and convenient lapses of memory, evasive answers and outright lies. Accordingly, we give little credence to it.

Despite the warnings, Vélez failed to report to work on Friday, May 25, 1984 as scheduled. He was thus suspended and instructed to report back to work on June 16, 1984. He was cautioned that should he be absent once again he would be permanently dismissed. On Friday, June 22, 1984, Vélez did not report to work and was, as a result, terminated on that same date.

As a result of the dismissal, Local 901 filed a grievance on behalf of Vélez following the procedures outlined in the collective bargaining agreement. The EEOC in turn commenced this action. Vélez was reinstated to his position pursuant to the order of the court dated June 25, 1984.

At the court's request, the parties filed motions describing their good faith efforts to accommodate Vélez' religious beliefs. Both defendants referred to Hilton's offer to employ Vélez as an unarmed security officer at his present salary.[2] Hilton also set forth as an alternative resolution to the scheduling conflict, the exclusion of the three doormen from the four-day-week clause of the collective bargaining agreement. The EEOC proposed in turn that the doormen continue to voluntarily alternate shifts not only among themselves but also among the security guards licensed to work as doormen.

## II—REQUEST FOR RELIEF

A. *The employer's duty of reasonable accommodation.*

Since the parties agreed to extend the effect of the temporary restraining order until the date of the trial, and since the petition for the preliminary injunction was consolidated with the request for permanent injunctive relief, we need not consider whether the requirements for the issuance of a preliminary injunction are met.

Instead, we turn to Hilton's duty of reasonable accommodation. Section 2000e–

2(a)(1) of Title 42, United States Code, makes it unlawful for an employer to discriminate against an employee on the basis of his religion.[3] Section 2000e(j) defines the term "religion" as:

... all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

■■■■ To establish a prima facie case of religious discrimination under Section 2000e–2(a)(1) a plaintiff must demonstrate (1) that he has a bona fide religious belief that conflicts with an employment requirement; (2) that he has informed his employer of this belief; and (3) that he was discharged for failure to comply with the conflicting employment requirement. *Turpen v. Missouri-Kansas-Texas R. Co.,* 736 F.2d 1022, 1026 (5th Cir.1984); *Brener v. Diagnostic Center Hospital,* 671 F.2d 141, 144 (5th Cir.1982); *Brown v. General Motors Corp.,* 601 F.2d 956, 959 (8th Cir.1979); *Anderson v. General Dynamics Convair Aerospace Div.,* 589 F.2d 397, 401 (9th Cir. 1978), *cert. denied sub nom International Association of Machinists, etc. v. Anderson,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979). Once a plaintiff has established his prima facie case, the burden then shifts to the defendant to show that it cannot reasonably accommodate the employee's needs without undue hardship. 42 U.S.C. § 2000e(j); *Turpen v. Missouri-Kansas-Texas R. Co.,* 736 F.2d at 1026; *Brener v. Diagnostic Center Hospital,* 671 F.2d at 144.

It cannot be gainsaid that Vélez has established a prima facie case of religious discrimination. He is a Seventh-Day Adventist, he so informed Hilton when he was

---

**2.** The use of firearms is against Vélez' religion.

**3.** Section 2000e–2(a)(1) provides:
It shall be an unlawful employment practice for an employer—
to fail or refuse to hire or to discharge any individual, or otherwise to discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;
...

first hired, and he was fired because he failed to comply with the requirement that he work on Fridays. Thus, the court is solely confronted with whether defendants could have reasonably accommodated Vélez' religious beliefs without incurring undue hardship.

■ There are no exact parameters defining what constitutes reasonable accommodations. Nonetheless, the duty to accommodate requires that the employer take certain affirmative measures to satisfy the employee's religious practices, but without (1) hindering the rights of other employees or (2) having to bear more than a *de minimis* cost in so doing. *Trans World Airlines v. Hardison*, 432 U.S. 63, 67, 97 S.Ct. 2264, 2268, 53 L.Ed.2d 113 (1977). In *Hardison*, the leading case in this area, the Supreme Court ruled that the following actions by the employer were reasonable efforts to accommodate the employee's religious beliefs:

(1) The employer had met on several occasions with the employee in order to resolve the problem.

(2) The employer had previously accommodated the employee's observance of his beliefs.

(3) The employer had authorized alternative shifts with other employees in order to accommodate the plaintiff.

(4) The employer attempted to find the plaintiff another job.

We find these factors dispositive of this case.

■ First, as evidenced earlier in our summation of the facts of this case, Hilton met with Vélez and with his representatives from the EEOC on several occasions to find a solution to the conflict. Due in part to the position adopted by the doormen and the union's decision not to exclude the doormen from the four-day-week clause, and in part to Mr. Vélez' intransigent stance and unwillingness to provide alternatives of his own, these meetings proved to be fruitless.

Second, Hilton had accommodated Vélez' religious beliefs in the past. From 1972 until 1982 Hilton arranged Vélez' shifts so that he could observe the Sabbath. It was not until the implementation of the new collective bargaining agreement and of the four-day work week that the situation changed. Third, Hilton at all times authorized the exchanging of shifts among the three doormen. Fourth, Hilton offered Vélez a position as a security guard and as a security supervisor comparable in pay and benefits to his position as casino doorman.[4] We therefore conclude that the efforts made to accommodate Vélez' religious needs were reasonable.[5]

Furthermore, Hilton sought to accommodate Vélez within the existing framework of the collective bargaining agreement without denying the benefits of the four-day week to other employees or incurring a greater than *de minimis* cost. By allowing Vélez to miss Fridays on a permanent basis, Hilton would force the other doormen, Tapia and Velázquez, to work overtime on consecutive shifts and thus interrupt their consecutive rest days against their wishes. Conversely, Hilton would be forced to relocate security guards or casino

---

**4.** The evidence adduced at trial showed that the position of security supervisor received $35 more than Vélez' actual job as a doorman. The EEOC's attempt to show that a doorman has additional income from tips fails to convince the court that a significant distinction exits between both positions. Similarly, Vélez' stance requiring Hilton to transfer him with his twelve year seniority is without merit. *See Hardison supra.* Moreover, there have been no lay-offs in the hotel's security department in the six years that Díaz has been Personnel Manager. In the event, however, that Vélez were to be dismissed from the new position in the future, and if such dismissal were unlawful, or in retaliation for

having commenced these proceedings, he would have proper redress in court.

**5.** The EEOC alleges that the court can only rely on the facts surrounding Vélez' July 2, 1983 suspension because it was that suspension that triggered the charge. We disagree. The relief sought by EEOC is Vélez' permanent reinstatement, and it redresses Vélez' dismissal, not the July 2 suspension. We are thus empowered to consider all efforts made by Hilton throughout the entire conflict with Vélez to determine whether it tried to make reasonable efforts to accommodate Vélez' religious beliefs.

supervisors, displacing them from their regular chores. These measures would not only leave one other position vacant, but would also necessarily entail the added risk that the replacement will not perform the doorman's duties. Thus, the security of the casino would be affected. In the event that the casino supervisor were called to cover for Vélez, game tables would be left unsupervised, affecting the integrity of the game and giving rise to the possibility that the casino would lose its license to operate for failure to comply with the Rules and Regulations of the Puerto Rico Tourism Corporation.[6] Clearly, all these alternatives would involve more than a *de minimis* cost to Hilton either in the form of lost efficiency or higher wages. To require Hilton to bear them, we find, is an undue hardship under *Hardison.*

At this point we emphasize that Title VII's use of the term "reasonable" suggests not solely a duty of the employer to find alternatives, but also a correlative duty of the employee "to make a good faith attempt to satisfy his needs through means offered by the employer. A reasonable accommodation need not be on the employee's terms only." *Brener v. Diagnostic Center Hospital,* 671 F.2d at 146. In fact, "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Id.* at 145–46.

Here, we find that Vélez never attempted to explore the possibilities for accommodation within the existing collective bargaining agreement. From the time the conflict first arose until trial, Vélez assumed a noncooperative position, expecting Hilton to resolve the problem without any compromise on his part.[7] Of course, he is entitled to

refuse any offer of new employment or other accommodation if he so desires, but he simply, then, cannot claim that the hotel has failed to satisfy his needs.

The EEOC alleges in its post-trial memorandum that Vélez is willing to continue to alternate shifts with the other doormen and with the security guards and to give up his pay for Fridays. In order to support the feasibility of such proposal the EEOC points to the conciliation period during which such arrangements were made. Nonetheless, this alternative fails to conclusively solve the conflict. Such a solution is necessarily based on voluntary arrangements between the doormen and, as such, there are times when these arrangements cannot be executed. Doorman Velázquez, for instance, testified that he is not willing to trade shifts on a permanent basis because his days of rest would be interrupted.[8] Tapia also testified that he would not be willing to trade with Vélez if it were inconvenient for him to do so. Furthermore, the fact that temporary arrangements were made to alternate shifts between the doormen during this conciliatory period does not suggest that it would be feasible to make such an arrangement permanent.

▉ Vélez' willingness to give up pay for the time he does not work is irrelevant since Title VII does not require the employer to pay an employee for time not worked because of religious reasons. Vélez' present assertion implies that, throughout the entire conflict and negotiations, he expected Hilton to pay for every Friday he refused to work because of his religious beliefs. The fact that temporary arrangements were made to alternate shifts between the doormen during the conciliatory period does not suggest that it would be

---

6. See Title 15 L.P.R.A. §§ 76a and 78.

7. The evidence presented reveals that while a solution was being sought, Vélez repeatedly informed Hilton that finding an alternative was the employer's problem and not his.

8. During the trial, the EEOC introduced a written statement of Velázquez whereby he indicated that he was willing to alternate with Vélez.

However, during voir dire Velázquez explained that he had signed the statement without assistance of counsel. He further established that when he signed the document he did not intend to give up his rights under the collective bargaining agreement to two consecutive days of rest. Accordingly, the written statement is not entitled to much weight.

feasible to make such an arrangement permanent.

Moreover, the issue here is whether Hilton has met its duty to make reasonable accommodations for Vélez' religious beliefs and not whether the alternatives tendered are entirely satisfactory to him. The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by employers, *see Bishop v. Wood,* 426 U.S. 341, 349, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976), except those of course which contravene the law. Here, however, as it has been established, no violation of Title VII did in fact occur.

B. *The union's duty of fair representation and of reasonable accommodation*

The EEOC claims that co-defendant Local 901 "has actively participated and acquiesced in [Hilton]'s discriminatory conduct and has failed to properly represent Vélez in this dispute." Furthermore, the complaint charges that the union failed to accommodate Vélez' beliefs.

■ As to Local 901's duty of fair representation to its members, suffice it to say that the union met its duty of fair representation by initiating the grievance procedure of the collective bargaining agreement upon Vélez' dismissal.[9]

Turning to the union's duty to accommodate, we find that while Section 2000e(j) refers to the employer's duty to reasonably accommodate the employee's religious beliefs, courts have applied this provision to the union. *Lutcher v. Musicians Union, Local 47,* 633 F.2d 880, 884 (9th Cir.1980).

■ Notwithstanding the existence of this duty, however, it appears that the union could not have undertaken reasonable accommodations short of excluding the doormen from the collective bargaining provision of the four-day week against their wishes. Such a measure would have deprived the two other doormen of the benefits of the collective bargaining contract. Moreover, Title VII does not impose "upon the unions the duty to ignore their contract under the circumstances of this particular case." *Hardison v. Trans World Airlines,* 375 F.Supp. 877, 882 (W.D.Miss.1974). We thus find and conclude that to require the union to ignore the provisions of the four-day week in every case in which an employee cannot meet his scheduled work shift because of his religious beliefs when it is detrimental to other employees who benefit by said provisions, would work an undue hardship on the union and its members.

In sum, Section 2000e(j) mandates that an employer and the union make good faith efforts to accommodate an employee's religious beliefs. It does not require that in so doing they override an established collective bargaining agreement. The record here shows that the employer did more than attempt to reasonably accommodate Vélez. It shows that Hilton bent over backwards to accommodate him.

In view of the above, plaintiff's requests for preliminary and permanent injunctive relief are hereby denied. It is ordered that the complaint herein be and is hereby dismissed. The clerk shall enter judgment accordingly.

SO ORDERED.

---

9. We reach this conclusion notwithstanding Vélez' testimony at trial that several union officials refused to intervene on his behalf. *See* note 1, *in fine.* Furthermore, during the conciliation process the union participated in several meetings to find a joint resolution to the scheduling conflict.