Ned N. **CARY**, Jr., Plaintiff,

v.

John **CARMICHAEL**, Tom **Posey, Anheuser–Busch, Inc., and John Mandaro,** Defendants.

Civ. A. No. 4:94cv188.

United States District Court, E.D. Virginia, Newport News Division.

Nov. 20, 1995.

Ned N. Cary, Jr., Toano, VA, pro se.

James Stephen Ellenson, Newport News, VA, for plaintiff Ned N. Cary, Jr.

Eva Susan Tashjian–Brown, McGuire, Woods, Battle & Boothe, Richmond, VA, Rodney A. Satterwhite, McGuire, Woods, Battle & Boothe, Richmond, VA, for defendants John Carmichael, Tom Posey, Anheuser Busch, Inc.

Jonathan G. Axelrod, Richard William Gibson, Beins, Axelrod, Osborne, Mooney & Green, P.C., Washington, DC, for defendant John Mandaro.

## OPINION AND FINAL JUDGMENT

DOUMAR, District Judge.

This matter comes before the Court upon objections to the United States Magistrate Judge's Report and Recommendation, which recommended that summary judgment or dismissal be granted to all defendants. The plaintiff, through counsel, has objected only to the recommendation that Anheuser–Busch, Inc., ("the Company") be granted summary judgment. This Court ACCEPTS AND ADOPTS the Report and Recommendation of the Magistrate Judge and GRANTS dismissal as to defendants Mandaro, Posey, and Carmichael, and summary judgment as to the defendant Company.

### I. Factual and Procedural History

As the Report and Recommendation makes clear, there are no factual disputes in this case. All of the facts have been derived from the parties' pleadings as well as plaintiff's responses to defendant's Request for Admissions. The Court therefore fully accepts and adopts the factual findings of the Magistrate Judge's Report and Recommendation. The Court will dispense with an entire recitation of the facts in this case but because the Court does address in detail the defendant Company's motion for summary judgment, this opinion reviews the facts relevant to that determination.

Teamsters Local 95 ("the Union") is the exclusive bargaining representative for the bargaining unit that includes all hourly-rated employees in the Company's brewing, packaging and shipping, laboratory, maintenance, and utilities departments. The Union and the Company were parties to a collective bargaining agreement that covered the period from April 1, 1991, up to and including February 28, 1994. Although the plaintiff was not a member of the Union, he was a member of the bargaining unit represented by the Union and thus was covered by the collective bargaining agreement. Article 45 of the collective bargaining agreement provided, in pertinent part:

> [The Company] may require each employee to submit to testing once during the term of this Agreement for the presence of illegal drugs. An employee tested under this paragraph shall receive at least sixty days advance written notice of the intended test date.... The employee shall sign for the notice.... Employees provided with timely written notice shall submit to the testing except for good cause shown. Good cause shall be an illness or injury documented by a doctor's certificate attesting to the illness or injury....
>
> ....
>
> Any employee who refuses to provide a urine specimen for testing or refuses to authorize the testing by signing a consent form shall be subject to immediate discharge.

Collective Bargaining Agreement Between Teamsters Local 95 and Anheuser–Busch, Incorporated, Entered April 1, 1991 ("Collective Bargaining Agreement"), Article 45. The Company's acknowledgment form itself contained a provision allowing the medical personnel conducting the urine testing to report the results to the employee relations manager of the Company. Such consent was and is required of any drug testing program to guarantee that the testing is done properly and in accord with professional medical standards, and further, medical personnel

are not allowed to release medical information to anyone other than the patient without authorization. Thus written consent is required as the Company's independent test sampling service will not collect a urine sample without a consent form and will not process a sample unless the employee signs the labels and other forms. Aff. of John Mandaro, filed Dec. 28, 1994, at ¶ 6.

The plaintiff was given proper notice on February 10, 1992, of a drug test scheduled for May 4, 1992. This notice contained an acknowledgment line, which plaintiff refused to sign. Plaintiff was given three opportunities to sign, on March 2, 3, and 5, and each time the Company attempted to explain the provisions of the consent form to no avail. Plaintiff stated he would provide urine samples, but would not consent to the Union's negotiation on his behalf to a drug testing program, so he would not sign the acknowledgment form.

Plaintiff's employment was terminated on March 5, 1992, for failure to sign the consent form as required by the collective bargaining agreement. Negotiation occurred on plaintiff's behalf through the Union, initiated by a grievance filed by plaintiff. Cary appeared at a grievance meeting on March 10, 1992, with a notarized affidavit stating, "I, Ned N. Cary, Jr. was notified by Mr. Fanok that I was scheduled for testing on May 4, 1992 on March 4, 1992 and agreed to provide a specimen on that date." After Cary submitted his statement, the Company offered to reinstate Cary with a week suspension, provided that Cary agreed to sign the consent form to provide the urine sample on May 4, 1992. The Union accepted this settlement on plaintiff's behalf. Although Cary has contended that he did not personally agree to sign the consent form, and further that the Union had no right to represent him, clearly as of Cary's reinstatement, the Union and the employer had agreed that the reinstatement was with the specific understanding that Cary would sign the consent form.

On March 16, 1992, both the Union representative and the Company attempted to telephone Cary, but he hung up on their telephone calls. Cary also admits he received a Western Union telegram on the night of March 16, 1992, advising him to return to work on March 17 because the grievance had been resolved. Plaintiff subsequently returned to work on March 17, 1992, with the understanding of the employer and the Union that he would sign the consent form.

Plaintiff thereafter submitted a letter to the Company on April 14, 1992, stating that his status as an ordained Baptist minister prohibited him "from exhibiting my own personal assent to duress." The Union representative responded to Plaintiff's letter by letter dated April 29, 1992, which asked plaintiff to provide "the specific prohibitions you claim prevent you from complying [with] all of the terms of the negotiated bargaining agreement" by April 30, 1992. Plaintiff failed to respond.

The Company conducted drug testing on May 4, 1992, and plaintiff again failed to sign the consent form. The Company explained the nature and the provisions of the form but plaintiff refused to place his signature on anything associated with the drug testing program, evidenced by plaintiff's letter dated May 14, 1992, which stated, "I must simply refuse to be forced to show consent in any way to policies or actions that would hurt these individual even more than they are already hurting," (referring to those individuals employed by the Company that plaintiff claims he counselled). Plaintiff was finally terminated on May 4, 1992, after failing to provide written consent to the testing. Plaintiff's representative in the Union attempted again to negotiate on plaintiff's behalf, and in the process sought information regarding the nature of plaintiff's specific objection, to which the plaintiff again failed to adequately respond. Frequent litigation ensued.

In one action plaintiff filed for unemployment with the Virginia Employment Commission, and at the hearing, stated as his religious objection that he "had on occasion counseled more than one of Anheuser-Busch employees in regards to substance abuse. I could not support any type of policy that would reveal whose [sic] those persons were and what their problems were. I consider their confidence in me to be of utmost impor-

tance and I could not compromise my integrity in the form of supporting a policy that I knew that could cause problems for others...." The Employment Commission found against the plaintiff.

Plaintiff also subsequently filed a charge against the Company with the Equal Employment Opportunity Commission, which then issued a determination on the merits of plaintiff's charge. Determination, E.E.O.C. Charge No. 121–92–0737, issued September 27, 1993. The Determination stated that there was "reasonable cause to believe Charging Party was denied a religious accommodation and thereby unlawfully discharged." *Id.* at 1. The Determination further states, "the Commission now invites the parties to join with it in a collective effort toward a just resolution of the matter," and attached a proposed conciliation agreement. *Id.* at 3. It is undisputed that the parties were unable to reach an agreement, and the Company has stated, without contradiction, that this failure was due to the fact that nothing in the proposed agreement addressed the drug testing issue. Defendants' Answer to Amended Brief, at ¶ 6.

This Court held, in plaintiff's prior case on the same facts against the Union, that the Company and the Union were *required* to negotiate regarding drug testing, that the collective bargaining agreement was valid, and that "the Union and Anheuser–Busch agreed upon provisions regarding drug testing that were applicable to all employees, including plaintiff." *Cary v. Teamsters Local 95*, Civil Action No. 4:93cv8, at 10, 1993 WL 814265 (E.D.Va.1993). That order granting summary judgment serves as the basis for the dismissal of defendant Mandaro in the instant action.

After the conclusion of the litigation of the prior action, this *pro se* action was instituted on December 13, 1994. Plaintiff originally sued two employees of the Company, John Carmichael and Tom Posey, the Corporation, and John Mandaro, the business agent for the Union, claiming wrongful discharge. During the initial pretrial conference, plaintiff was directed to file an amended complaint, setting forth his claim more specifically. Plaintiff complied and filed a document entitled "Plaintiff's Ammended [sic] Brief." *See* Magistrate Judge's Report and Recommendation, at 2. All defendants subsequently submitted motions to dismiss.

The Magistrate Judge's Report and Recommendation recommended dismissal as to all defendants except for the Company. In relation to the Company's motion, the Magistrate Judge converted the motion by the Company to a motion for summary judgment. The Report and Recommendation granted summary judgment in favor of the Company. Plaintiff's attorney does not contest the Magistrate Judge's determination that all of the individual defendants must be dismissed—Mandaro on *res judicata* grounds because the union already won the earlier suit over unfair representation,[1] and the two individual employees of the Company because such individuals are not liable under Title VII. Therefore court fully ACCEPTS and ADOPTS the Magistrate Judge's recommendation to dismiss these defendants for the reasons contained in his report.

Plaintiff now objects to the Report and Recommendation.[2] He centers his objection upon the fact that the Company had previously accepted the plaintiff's affidavit in lieu of Cary acknowledging his receipt of the 60-day notice of testing. In essence, plaintiff is arguing that the Company had accepted an alternative form once, and then states that "ABI knew that Cary had a problem with signing their consent form, and made no effort to try to work with him on a form

---

1. The magistrate judge recommended that plaintiff be assessed monetary sanctions under Rule 11 for his attempt to reopen the case against the union. (R & R at 12). This court declines to impose such sanctions given the prompt abandonment of all untenable aspects of plaintiff's case once counsel was employed.

2. The Court notes that plaintiff's submission makes no specific objection to the Report and Recommendation itself. This is likely due to the fact that the "Objection," except for a few lines, is a verbatim copy of plaintiff's response to defendants' motion to dismiss, which obviously was submitted to the Court before the Report and Recommendation was filed. Again out of deference to plaintiff's counsel's late inclusion in this case, however, the Court will address the specific claims made in the Objection.

which he could sign which would satisfy both sides." Pl.Obj. to Magistrate Judge's Report and Recommendation, at 3. However this earlier affidavit only acknowledged receipt of notice of the testing, and not consent to the testing itself. Furthermore, Cary then and now has clearly stated that he would not execute any type of consent form. At the end of the hearing in the district court, discussed further below, Cary indicated that he would then execute an affidavit that he was willing to take the drug test, but reiterated that he would not sign a consent form. The Court remains perplexed as to how the plaintiff could sign an affidavit which would permit testing of the plaintiff but not sign a consent form. Yet this potential alternative only arose after the hearing on the objection to the Magistrate Judge's Report and Recommendation, and therefore should be of no consequence to the question before the Court. However, out of an abundance of caution, the Court will discuss the issue.

█ As for the motion for summary judgment by the Company, the Court will delve deeper into the law and facts of this case, as it presents a number of novel questions both for this Court and within the Fourth Circuit. In viewing the entire record as a whole, this case does not present a failure to accommodate a religious belief, but rather is part of an ongoing struggle between the plaintiff, the Union, and the Company with respect to the power of the Union to represent the plaintiff before the Company. That case was previously decided by this Court, and should not be reopened by plaintiff's invocation of the specter of religious discrimination subsequent to having fully and fairly litigated (and lost) his grievance before this court and on appeal. *See Cary v. Teamsters Local Union No. 95*, Fourth Circuit Court of Appeals Civ.Action No. 93–1497, 1994 WL 168460 (4th Cir. May 4, 1994) (finding Cary's appeal to be without merit). Clearly the Company was within its power to discharge plaintiff the first time he refused to sign the consent form. When plaintiff was reinstated it was with the express understanding that he sign the consent form, and at that time religion had never been raised by the plaintiff. Subsequently, plaintiff breached the agreement that was reached between the Company and

plaintiff's Union representative. Only at that point did plaintiff raise the flag of religion. Moreover plaintiff failed to ever assist the Company (or the Union on his behalf) in its efforts to understand his objection in order to enable accommodation or to give notice of the nature of the religious deterrent, which in this case is in no way obvious. The Court is convinced that the Magistrate Judge's recommendation that summary judgment be granted on this ground is appropriate on the ground that religion was not the motivating factor of the dispute. The Magistrate Judge stated that "the dispute is truly about the Union and the company negotiating a drug testing policy to which the plaintiff objects, but is bound, and not a religious discrimination case." The Court adopts this finding.

The unique facts of this case, however, may present a question of whether plaintiff did raise a religious objection which, under normal circumstances, would require an attempt at accommodation by the employer. Because the Court wishes to discuss this matter in its entirety, the Court will address this issue, despite having already accepted the Magistrate Judge's Report and Recommendation. However for the remainder of this opinion the Court assumes, though having accepted the Magistrate's Report finding otherwise, that plaintiff's religious objection to the signing of the consent form is the central issue in the case.

As stated above, at this Court's hearing on defendants' motions, out of deference to Cary's original *pro se* status and the late involvement of counsel, and out of an abundance of caution regarding the granting of summary judgment against a possibly meritorious claim because of previously poor prosecution, the court took the unusual step of permitting Cary's new counsel to question Cary under oath regarding his willingness to sign an alternative consent form had one been devised. Cary initially balked at these efforts and had an emotional outburst, storming off the witness stand. Only after a lengthy recess and upon conferring with counsel was an affidavit granting permission to use the sample for "any purpose" and report any test results back to the company produced. Yet plaintiff continued to refuse

to sign a consent form. Again the logic of the distinction eludes the Court.

At no time during a protracted hearing before the Magistrate Judge nor in the hearing before the undersigned was there ever any such assent, nor was the content of what caused the conflict in plaintiff's mind ever presented, even after this affidavit was produced. All that was ever expressed by plaintiff was that he held a personal religious belief against signing the consent form. Thus it is important to note that at no time did plaintiff ever clearly explain his religious objection to signing the consent form nor explain what the religious problem was. Most importantly, however, this affidavit by plaintiff at this late time is of no import to the instant decision. The relevant conduct to the issue before the Court must have occurred before the final discharge of plaintiff by the Company.

Counsel for the defendant objected to the Court's leniency to plaintiff at the hearing, correctly insisting that the only relevant evidence was what had occurred at or prior to the time of discharge, and what evidence had been presented accompanying the motions for summary judgment before the Magistrate Judge. Counsel also stated that the proffered form was insufficient to procedurally protect the employer and/or the testing agency because it did not contain all of the substantive information found in the Company form. The Court recognizes that neither plaintiff's belated reversal appearing to have been caused by the pressure of losing this litigation, nor twenty-twenty hindsight by this Court, are appropriately part of the Court's present determination.

## II. *Legal Standard*

### A. *Summary Judgment*

■ To sustain a motion for summary judgment, the Court must find that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party seeking summary judgment is initially responsible for identifying the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). When this burden is met, the non-moving party must show, through affidavits or other proof, that a genuine issue of material fact does exist. *Catawba Indian Tribe v. South Carolina,* 978 F.2d 1334, 1339 (4th Cir.1992), *cert. denied,* 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993). "The mere existence of a scintilla of evidence" will not support this finding. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

■ Summary judgment must be entered against a non-moving party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact....'" *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552. In deciding the motion, the Court must view all inferences drawn from the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### B. *The E.E.O.C. Determination*

■ As an initial matter, the Court notes that plaintiff's reliance on the Determination by the E.E.O.C. is misplaced for a number of reasons. First, a "reasonable cause" determination, where conclusory and not based upon independent investigation, alone may not be sufficiently probative to create a genuine issue of material fact. *Goldberg v. B. Green and Co.,* 836 F.2d 845, 848 (4th Cir.1988). *See also Ross v. Communications Satellite Corp.,* 759 F.2d 355, 363 (4th Cir.1985) (holding that E.E.O.C. proceedings, while relevant, are no substitute for the independent judgment of the district court on a motion for summary judgment). In this case, the facts presented in the E.E.O.C. Determination were wholly based upon the same facts alleged by plaintiff, and then states in conclusory fashion that "reasonable cause" existed reflecting religious discrimination. Determination, E.E.O.C. Charge No. 121–92–0737, issued September 27, 1993. More significantly, even if the determinations of an agency were controlling

in such a situation, the instant Determination of "reasonable cause" is a tentative determination, and not a letter of violation that the Company in fact violated Title VII. *See E.E.O.C. v. Manville Sales Corp.*, 27 F.3d 1089, 1095 (5th Cir.1994) (stating that a letter of reasonable cause is more tentative than a letter of violation and holding that the former are admissible, the latter may be unduly prejudicial as evidence before a jury in a de novo trial). The Determination merely invited the parties to seek a conciliation through the proposed conciliation agreement. There has been no evidence presented to the Court that the E.E.O.C. subsequently ever brought suit against the Company on plaintiff's behalf, issued plaintiff a right-to-sue notice, or in fact had any involvement in the case beyond the proposed conciliation agreement. Finally, this proposed conciliation agreement, though approximately ten pages long, also completely fails to address the drug testing issue. Therefore the Court puts little weight in the E.E.O.C. determination of September 27, 1993. *Goldberg*, 836 F.2d at 849.

### III. *Religious Discrimination in Employment*

#### A. *Statutory Provisions*

Claims of religious discrimination are properly analyzed under Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e–2(a)(1).[3] Nearly all of the cases involving this subsection having to do with religion arise when an employer fails to hire a prospective employee or fails to allow missed days for a present employee because of religious belief. As could be expected, Sabbatarianism has been the most common religious belief causing conflict.[4] *E.g., E.E.O.C. v. Ithaca Industries, Inc. (II)*, 849 F.2d 116 (4th Cir.), *cert. denied* 488 U.S. 924, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988). However, the subsection has been interpreted to cover more than just time off from work. *E.g., McDaniel v. Essex Int'l, Inc.*, 571 F.2d 338, 342 (6th Cir.1978) (stating that the section "applies to all religious observances and practices and is not limited to claims of discrimination based on requirements of Sabbath work."); *Yott v. North American Rockwell Corp.*, 501 F.2d 398 (9th Cir.1974) (payment of union dues against religion).

▮▮▮ Although the Fourth Circuit has never announced a test, nearly every other circuit has implemented a two-step process for allocating the burden of proof under this provision, as well as the Supreme Court by reference. A plaintiff makes out a prima facie case of religious discrimination by proving: (1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the em-

---

**3.** 42 U.S.C. § 2000e(j) provides:

(j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business. 42 U.S.C. § 2000e–2(a)(1) provides, in relevant part:

(a) Employer practices. It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

Subsection (j) is awkwardly phrased, as it would appear that any belief or practice that an employer cannot accommodate without undue hardship has been defined out of the word "religion." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 63 n. 1., 107 S.Ct. 367, 369 n. 1, 93 L.Ed.2d 305 (1986). Regardless of this phrasing, however, courts have faithfully attempted to derive the statute's meaning.

**4.** According to the E.E.O.C., the most common religious practices sought to be accommodated are: observance of a sabbath or religious holiday; need for prayer breaks during working hours; dietary requirements; the practice of not working during a mourning period for a deceased relative; religious prohibitions against medical examinations; religious prohibitions against membership in labor and other organizations; and personal clothing grooming habits. 29 C.F.R. §§ 1605.2–.3 Appx. A, subsection (3) (reporting the findings of the E.E.O.C. hearings of 1978 in New York City, Milwaukee, and Los Angeles). Refusal to sign documents, or for that matter refusal to participate in drug testing, cannot be fairly read into any of the above practices. The Court therefore recognizes the uniqueness of the instant case and, while affording plaintiff every conceivable advantage as a *pro se* party, must be flexible in applying this statute to novel claims of religious discrimination.

ployer of this belief; and, (3) he or she was not hired or promoted, fired, or otherwise discriminated against for failure to comply with the conflicting employment requirement. Once the burden shifts to defendant, the employer must show that it was unable reasonably to accommodate the plaintiff's religious needs without undue hardship. *E.g., Philbrook v. Ansonia Bd. Of Educ.*, 757 F.2d 476, 481 (2d Cir.1985) *aff'd and remanded*, 479 U.S. 60, 65, 107 S.Ct. 367, 370, 93 L.Ed.2d 305 (1986) (stating that the Court of Appeals utilized the above formulation and affirming the judgment of the Court, but remanding to the District Court for additional findings); *E.E.O.C. v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 221–22 (6th Cir. 1991); *Beasley v. Health Care Service Corp.*, 940 F.2d 1085, 1088 (7th Cir.1991); *E.E.O.C. v. Hacienda Hotel*, 881 F.2d 1504, 1512 (9th Cir.1989); *Jenkins v. Louisiana*, 874 F.2d 992, 995 (5th Cir.1989) *cert. denied* 493 U.S. 1059, 110 S.Ct. 871, 107 L.Ed.2d 955 (1990); *Toledo v. Nobel–Sysco, Inc.*, 892 F.2d 1481, 1486 (10th Cir.1989) *cert. denied* 495 U.S. 948, 110 S.Ct. 2208, 109 L.Ed.2d 535 (1990); *Getz v. Pennsylvania, Dep't of Public Welfare*, 802 F.2d 72, 73 (3d Cir.1986); *Johnson v. Angelica Uniform Group, Inc.*, 762 F.2d 671, 673 (8th Cir.1985); *U.S. E.E.O.C. v. J.P. Stevens and Co.*, 740 F.Supp. 1135, 1137 (M.D.N.C.1990).

Under the above test and given the facts of this case, the Court will assume plaintiff's bona fide religious belief for the purposes of the summary judgment motion. Likewise, the Court will also assume that plaintiff was fired for failure to comply with the employment requirement that the plaintiff felt conflicted with his bona fide religious belief (regardless of whether defendant knew of the belief at the time of dismissal). The Court holds, however, that the plaintiff has failed to establish the notice element of his prima facie case of religious discrimination under Title VII.

### B. *Notice*

The purpose of the notice requirement in this context is two-fold. First, only when sufficiently notified would any employer have an opportunity to take reasonable steps to accommodate an employee's conflict. For example, if an employee states only that his religion, for example, prevents him from sending mail, or arriving at work at a certain time, or wearing safety equipment, and does not elaborate further, the employer has no hint of how it should proceed to accommodate the employee. A number of cases show the importance of this kind of knowledge. In *Chrysler Corp. v. Mann*, the Eighth Circuit stated that the plaintiff "did little to acquaint Chrysler with his religion and its potential impact upon his ability to perform his job." 561 F.2d 1282, 1285 (8th Cir.1977), *cert. denied* 434 U.S. 1039, 98 S.Ct. 778, 54 L.Ed.2d 788 (1978). The Seventh Circuit in *Redmond v. GAF Corp.* focussed on this section of the *Mann* decision and interpreted the Eighth Circuit decision as stating that "an employee who is disinterested in informing his employer of his religious needs 'may forego the right to have his beliefs accommodated by his employer.'" 574 F.2d 897, 902 (7th Cir.1978) (quoting *Mann*, 561 F.2d at 1286). The Court in *Redmond* further stated:

> We agree with defendant that accommodation is not so onerous as to charge an employer with the responsibility for continually searching for each potential religious conflict of every employee. The employee has the duty to inform his employer of his religious needs so that the employer has notice of the conflict.

574 F.2d at 902 (finding that plaintiff adequately supplied his employer with notice of a conflict when plaintiff stated to the employer that he could not work on Sunday because he attended Bible classes).

The Ninth Circuit reviewed the analysis of *Redmond* and *Mann* and developed a standard to judge notice, stating the following:

> A sensible approach would require only enough information about an employee's religious needs to permit the employer to understand the existence of a conflict between the employee's religious practices and the employer's job requirements....
>
> Any greater notice requirement would permit an employer to delve into the religious practices of an employee in order to determine whether religion mandates the employee's adherence. If courts may not

make such an inquiry, then neither should employers.

*Heller v. EBB Auto Co.,* 8 F.3d 1433, 1439 (9th Cir.1993) (citations omitted).

██ The first time plaintiff gave the Company any inkling of his religious objection was in the letter of April 14, 1992, where he stated:

My religious faith as an ordained Baptist Minister, *prohibits me from exhibiting my own personal assent to duress.* I not only hold this religious belief for myself but support it for others. Clearly, my refusal to sign is such a small inconvenience to the company when weighed against the fact that I am giving my urine and when weighed against my right to exercise my religious belief that it cannot be used as justification for discharging me.

Letter of April 14, 1992 (emphasis in original *exactly* as written).[5] It is clearly impossible from this statement to discern to what it is the plaintiff is objecting. This letter, coupled with plaintiff's failure to raise this objection at the earlier discharge *and* his subsequent unwillingness to elaborate on this belief to the employer, failed to provide defendant with adequate notice. Requiring more of Cary in this case would not "delve into [his] religious practices" but rather would have allowed the defendant an opportunity to accommodate plaintiff's religious needs, if at all possible. The point here is not that under all circumstances must an employee address in detail his religious conflict. That has been explicitly rejected. *See Heller,* 8 F.3d at 1439. But where, as here, the employee objects to a routine employee obligation, such as the signing of a form, and only states his status as a Baptist minister as his reason for so objecting, it becomes obvious to no one

(and the Court would expect even the most religious Baptist minister) to what it is the employee is objecting.

In the Sabbatarianism cases, the very statement that one cannot work on a particular day because of religion immediately lends itself to accommodation, or at the very least imparts enough understanding to facilitate discussion. Here, however, was a case where the plaintiff belatedly put forth the vaguest descriptions of a religious objection. This objection was further taken on behalf of a group of religious individuals (Baptist ministers) in a completely unique and novel form, and was applied to a highly common employee function. Surely plaintiff must be required to put forth more to the employer before the employer can fairly be found to have notice of a bona fide religious objection. The Court holds that where an employee states vaguely that his beliefs prevent him from signing a required document, and then further refuses attempts to clarify the employees belief, the employer has no information to rely on to attempt to accommodate the employee, and therefore cannot be held to have violated Title VII.

██ Second, and probably more important, the notice requirement goes directly to the heart of the statute. If an employer has not been given adequate notice of an employee's religious conflict, then *ipso facto* the religious animus that the statute was designed to prevent cannot have existed. *See, e.g., International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977) (stating that claims under Title VII generally of "disparate treatment" require proof of discriminatory motive, whereas a "disparate impact" claim does not require

---

**5.** Plaintiff's "Ammended [sic] Brief," which the Magistrate Judge recognized as plaintiff's amended complaint, appears to state that a meeting occurred between plaintiff and A–BI on March 4, 1992. "Ammended [sic] Brief," at 2. The amended complaint also appears to claim that at that time plaintiff stated that he was a Baptist minister. The Court finds, however, that plaintiff, and his counsel, subsequently disavowed any such allegation, as plaintiff's responses to defendant's Request for Admissions clearly indicate that the first time plaintiff raised reli-

gion in the instant context was by his letter of April 14, 1992. *See* Request For Admission Nos. 24, 25, and 27. Furthermore, defendant already had knowledge of plaintiff's status as a Baptist minister. *See Cary v. Anheuser–Busch, Inc.,* 741 F.Supp. 1219, 1220 (E.D.Va.1988) (opinion of Doumar, J.) (recounting plaintiff's religious beliefs in another action by plaintiff against A–BI before this Court). Defendant's mere knowledge that plaintiff is a minister, without more information linking this status to plaintiff's objection to signing the consent form, has no bearing on the outcome of this case.

proof or discriminatory motive).[6] This case is a prime example of this latter goal of the notice requirement. If it is true that plaintiff was fired the first time prior to *ever* having raised his religious objection, then that is strong, if not conclusive, evidence that employer never possessed the religious animus in ultimately discharging plaintiff a second time based on the same behavior. Furthermore, plaintiff was subsequently rehired with the understanding, as properly agreed to by the Union on plaintiff's behalf, that plaintiff would sign a consent form prior to the scheduled drug testing. When once again plaintiff refused to sign and further refused to clarify his religious belief, it becomes abundantly clear that religious animus in no way precipitated the actions of the defendant.

Two district court cases have found that the plaintiff failed to satisfy the burden of providing the employer with adequate notice, intimating that no religious discrimination was possible without notice. In *Wessling v. Kroger Co.*, a district court in the Eastern District of Michigan found that plaintiff's request to leave early from work was not in terms of a request for a religious accommodation, and therefore the defendant "did not have proper notice of [plaintiff's] request for a religious accommodation." 554 F.Supp. 548, 552 (E.D.Mich.1982). Similarly, a district court within the Fourth Circuit found that the plaintiff told only a coworker, and not his employer, of a religious conflict, and therefore could not satisfy the burden of a prima facie case. *J.P. Stevens,* 740 F.Supp. at 1137. These are two very straightforward applications of the notice requirement, showing that the employer could not have fired the employee because of religion when the employer never even knew that religion was involved.

Similarly, in *Johnson v. Angelica Uniform Group, Inc.,* 762 F.2d 671 (8th Cir.1985), the plaintiff was hired by defendant subject to the collective bargaining agreement which provided that an employee would be subject to termination after missing sixteen days in any twelve-month period. *Id.* at 672. Dur-

ing an approximately one-month period in mid–1978, plaintiff missed ten work days, and was subsequently given a verbal warning for absenteeism, yet plaintiff did not mention her religious obligations at that time. After missing two more days, plaintiff received her first written warning. *Id.* At that time, plaintiff stated she would need time off two months later for religious purposes, but did not mention the specific dates involved. On October 10, 1978, plaintiff wrote the plant manager and stated that she would need the following two weeks off for religious purposes. After two more absences, plaintiff was fired on October 13th. *Id.*

The district court in *Johnson* found that plaintiff had been discharged not because of a conflict between her religious duties and her employment, but because of excessive absenteeism as provided in the collective bargaining agreement. *Id.* at 673. The Eighth Circuit agreed with the district court that plaintiff had failed to establish the elements of a prima facie case of religious discrimination, as plaintiff "clearly did not satisfy the notice element of the prima facie requirements." *Id.* The Court further stated that, because the plaintiff "failed to give the required notice, it is clear that her termination was due to excessive absenteeism and not because of a conflict between an employment requirement and her religious faith." *Id.* at 674.

 This last excerpt highlights the purpose of the notice requirement. Without notice, an employer cannot be found to have acted "because of" the religious conflict. The Fifth Circuit suggested this intention of the statute in *Turpen v. Missouri–Kan.–Tex.R. Co.:*

> Title VII's prohibition of religious discrimination in employment, 42 U.S.C. § 2000e(j), provides that an employer engages in an unfair employment practice if he discriminates against an employee *because of* any aspect of his religious practices or beliefs, unless the employer shows that he cannot "reasonably accommodate" the employee's religious needs without

---

**6.** Note that the plaintiff here is not claiming "disparate impact" but rather disparate treatment through A–BI's failure to accommodate

plaintiff's purely personal religious beliefs and practices.

"undue hardship on the conduct of the employer's business."

736 F.2d 1022, 1026 (5th Cir.1984) (emphasis added). The phrase "because of" in this context implies the religious animus that the Civil Rights Act was developed to prevent. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 240–41, 109 S.Ct. 1775, 1785–86, 104 L.Ed.2d 268 (1989) (holding that the "because of" language in Title VII is not to be construed as a traditional "but-for" test, and so where an employer relies on both gender and legitimate factors in making an employment decision, the employer must show that the same decision would have been forthcoming without the illegitimate considerations);[7] *see also International Brotherhood of Teamsters*, 431 U.S. at 335–36 n. 15, 97 S.Ct. at 1854–55 n. 15. It stands to reason then, that a discharge of an employee for failure to comply with valid employment requirements, where the employer does not have sufficient knowledge of an employee's religious beliefs or practice despite the fact that the employer knows that a conflict has arisen, cannot be held to violate the statute.

In this case, without notice of plaintiff's religious belief prior to his first discharge, any court would be hard-pressed to find that plaintiff was fired the first time because of his religious beliefs. Furthermore, even after the second discharge and prior to the proposed second grievance hearing, the plaintiff did not articulate what "conflict" was caused by his religion. He still has failed to so articulate. Summary judgment for failure to establish the prima facie elements is appropriate, then, as the Court finds that plaintiff's failure to timely and properly notify the Company both precludes any finding that plaintiff was fired *because of* his religious beliefs, and prevented any attempt by the Company to accommodate the religious beliefs or practices of its employee.

### C. *Accommodation*

██ Once a plaintiff has brought enough evidence forward to establish a prima facie case of religious discrimination, the burden shifts to the defendant, which must show that it reasonably attempted an accommodation, short of causing an undue hardship on the employer. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74, 97 S.Ct. 2264, 2271, 53 L.Ed.2d 113 (1977). In *Hardison*, the Supreme Court stated that an accommodation causes "undue hardship" whenever that accommodation results in "more than a *de minimus* cost" to the employer. 432 U.S. at 84, 97 S.Ct. at 2276; *see also Ansonia Bd. Of Educ. v. Philbrook*, 479 U.S. at 67, 107 S.Ct. at 371 (interpreting *Hardison* ). Thus in the present case, even if the defendant had adequate notice of plaintiff's religious basis for refusing to sign the consent form, summary judgment is still appropriate for two reasons: Cary failed to fulfill his duty to cooperate by failing to give the Company enough information to merely comprehend his objection to signing the consent form; and, plaintiff's position was such that no accommodation short of an undue burden would suffice.

██ In *Philbrook*, the Supreme Court acknowledged various circuit court decisions holding that, although the employee must not be required to accommodate or alter his or her religious beliefs, a duty may be imposed upon the employee to affirmatively seek to resolve the situation. 479 U.S. at 69, 107 S.Ct. at 372. The Supreme Court analyzed the legislative history to determine the extent of the accommodation burden, quoted a Fifth Circuit decision, and then stated that the Court of Appeals in the case before it

---

7. Interestingly, Congress rejected the Court's holding, and § 107 of the Civil Rights Act of 1991 provided:

 [A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C.A. § 2000e–2(m) (West Supp.1994); *see Preston v. Commonwealth of Virginia ex rel. New River Comm. Coll.*, 31 F.3d 203, 207 (4th Cir. 1994) (noting the Congressional override of the *Hopkins* decision by the Supreme Court).

This legislative act provides even more support for the "religious animus" argument described in the text. Quite simply, something cannot be a "motivating factor" unless there is intent, or at the very least, adequate knowledge of the religious conflict.

had inappropriately required more of an employer:

> Senator Randolph, the sponsor of the amendment that became § 701(j) [of Title VII of the Civil Rights Act of 1964], expressed his hope that accommodation would be made with "flexibility" and "a desire to achieve an adjustment." Consistent with these goals, courts have noted that "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." Under the approach articulated by the Court of Appeals, however, the employee is given every incentive to hold out for the most beneficial accommodation, despite the fact that an employer offers a reasonable resolution of the conflict. This approach, we think, conflicts with both the language of the statute and the views that led to its enactment. We accordingly hold that an employer has met its obligation under § 701(j) when it demonstrates that it has offered a reasonable accommodation to the employee.

*Id.* (citations and footnote omitted) (quoting *Brener v. Diagnostic Center Hospital,* 671 F.2d 141, 145–46 (5th Cir.1982)). This passage is helpful to the present case in a number of ways. First, it acknowledges cases that place a burden upon the employee to attempt to work with the employer in reaching a conclusion. In the instant case the employee did not do so, in that he never made his position clear, nor did he ever express any possible alternative type of form once he knew that it was required. Second, the passage in *Philbrook* inextricably leads to a conclusion that, where the plaintiff has taken a position that cannot be reasonably accommodated, attempts at accommodation by the employer are no longer required, as they would lead to an "undue burden." Thus in the instant case, the fact that Cary would not budge from his position that he would never sign anything related to the drug testing program, coupled with conclusions that the collective bargaining agreement was valid and the Company or its agents could never test an employee's urine, or use the results of such a test, without the employee's valid written consent, lead inextricably to a finding

that nothing short of an "undue burden" would have been required of the Company to accommodate plaintiff's stated religious objection. The following two subsections examine plaintiff's duty to cooperate and plaintiff steadfast position with respect to the Company's accommodation burden.

### 1. *Employee's Duty To Cooperate*

As stated above, the Supreme Court has put its imprimatur upon the duty of an employee to cooperate with the employer, but not so far as to compromise his or her beliefs. *Philbrook,* 479 U.S. at 69, 107 S.Ct. at 372. In a case between these same parties but related to a request for release from overtime, this Court similarly held that the employee has a correlative duty to make a good faith attempt to satisfy his needs through means offered by the employer. *Cary v. Anheuser–Busch, Inc.* 741 F.Supp. 1219, 1222 (E.D.Va.1988) (opinion of Doumar, J.), *aff'd* 904 F.2d 699 (4th Cir.), *cert. denied* 498 U.S. 907, 111 S.Ct. 276, 112 L.Ed.2d 232 (1990). It is clear that Title VII plaintiffs are under no duty to propose the specific means to accommodate their religious practices. *Redmond,* 574 F.2d at 901. However, the employee's duty to cooperate has been well-recognized. For example, the Fifth Circuit in *Brener* described the duty in the following manner:

> [B]ilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business. Although the statutory burden to accommodate rests with the employer, the employee has a correlative duty to make a good faith attempt to satisfy his needs through means offered by the employer.

671 F.2d at 146 (quoted by the Supreme Court in *Philbrook,* 479 U.S. at 69, 107 S.Ct. at 372). Similarly, the Eighth Circuit in *Mann* exhibited concern over an employee appearing to take advantage of the accommodation requirement in the statute, and must be quoted at length taste the full flavor of the Court's reasoning:

> 42 U.S.C. § 2000e(j) delimits an employer's ultimate duty of accommodation in terms of the imposition of an undue hard-

ship on the conduct of its business. The statute does not explicitly address, however, the penultimate duties of the employee, inherent in his relationship to his employer, to attempt to accommodate his beliefs himself and to cooperate with attempts at reasonable accommodation by his employer. *An employee cannot shirk his duties to try to accommodate himself or to cooperate with his employer in reaching an accommodation by a mere recalcitrant citation of religious precepts.* Nor can he thereby shift all responsibility for accommodation to his employer. Where an employee refuses to attempt to accommodate his own beliefs or to cooperate with his employer's attempt to reach a reasonable accommodation, he may render an accommodation impossible. In such a case, *the employee himself is responsible for any failure of accommodation and his employer should not be held liable for such failure.* 561 F.2d at 1285 (describing the situation before the court as an "impasse" for which the plaintiff was responsible) (emphasis added).

Other courts have noted that the language in *Mann* should not be read as to require an employee to compromise his or her beliefs. *Redmond,* 574 F.2d at 901–02. In fact such a requirement has been held invalid. *See Heller,* 8 F.3d at 1439 (stating that, in terms of notice, requiring an employee to state more about his religious duties than that a conflict does exist "would permit an employer to delve into the religious practices of an employee in order to determine whether religion mandates the employee's adherence. If courts may not make such an inquiry … then neither should employers," citing *Fowler v. Rhode Island,* 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953) (stating that "it is no business of the courts to say … what is a religious activity or practice.")) Rather, the duty on the plaintiff is a good faith effort at mutual cooperation. *See, Redmond,* 574 F.2d at 901 (stating that the concept of "mutuality of obligation" is inherent in accommodation). *See also Yott v. North American Rockwell Corp.,* 602 F.2d 904, 907–08 (9th Cir.1979) (finding that where the plaintiff refused a suggestion by his employer that he

pay his union dues to any charity of his choice, "accommodation does not appear possible.").

The courts addressing this duty incumbent upon the employee have stated that the employer must first make an attempt at accommodation before the employer can claim the employee has not cooperated in the search for an accommodation. *E.g., Ithaca Industries (II),* 849 F.2d at 118; *Toledo v. Nobel–Sysco, Inc.,* 892 F.2d at 1488. Before looking at this authority further however, the words of a few courts describing the accommodation requirement should be noted:

> The reasonableness of an employer's attempt at accommodation cannot be determined in a vacuum. Instead it must be determined on a case-by-case basis; what may be a reasonable accommodation for one employee may not be reasonable for another.

*Smith v. Pyro Mining Co.,* 827 F.2d 1081, 1085 (6th Cir.) *reh'g denied* 45 Empl. Prac.Dec. (CCH) ¶ 37, 614 (6th Cir.1987), *cert. denied* 485 U.S. 989, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988). Similarly, the *Redmond* Court stated:

> The term "reasonable accommodation" is a relative term and cannot be given a hard and fast meaning. Each case involving such a determination necessarily depends upon its own facts and circumstances, and comes down to a determination of "reasonableness" under the unique circumstances of the individual employer-employee relationship.

574 F.2d at 902–03; *accord United States v. Albuquerque,* 545 F.2d 110, 114 (10th Cir. 1976), *cert. denied* 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1092 (1977).

The Fourth Circuit has addressed the situation where an employee's position prevented any attempt at accommodation. In *Jordan v. North Carolina Nat. Bank,* 565 F.2d 72 (4th Cir.1977), where the plaintiff during the employment interview stated that she absolutely could never work on Sunday, the Fourth Circuit stated that the plaintiff's "pre-requirement on its face was so unlimited and absolute in scope—never to work on Saturday—that it speaks its own unreason-

ableness and [was] thus beyond accommodation." *Id.* at 76. The plaintiff's position was such that accommodation was impossible.

It is arguable in the Fourth Circuit called into question this holding in *Jordan* from the present case. 849 F.2d 116 (4th Cir.1988). *Ithaca Industries (II)* was a reversal of a district court decision which was originally affirmed on appeal. *Id.,* 829 F.2d 519 (4th Cir.1987). The plaintiff in *Ithaca Industries* refused to work on his Sabbath, and the first appellate decision noted how similar the case before it was compared to *Jordan. Ithaca Industries (I),* 829 F.2d at 522. The Fourth Circuit in the first appeal followed *Jordan* and stated that, "[b]y his own absolutist position, [the plaintiff] precluded [defendant] from making a reasonable accommodation for his religious practices." *Id.*

On rehearing, the Fourth Circuit reversed the decision of the district court and rejected its earlier decision, finding *Jordan* not controlling, as the defendant in *Jordan* had made at least some efforts at accommodation. *Ithaca Industries (II),* 849 F.2d at 118–19. The Fourth Circuit further stated that the defendant in the case before had made no attempts at accommodation "by any of the methods suggested by the guidelines in the regulations." *Id.* at 119 (citing 29 C.F.R. 1605.2(d)(1)(i), the E.E.O.C. regulations regarding accommodation of religious practices in the workplace). Further, the Court stated that "[t]o the extent that *Jordan* can be read to say that an absolute refusal to work on the Sabbath is beyond accommodation, it is expressly overruled." *Id.* at 119 n. 3.

*Ithaca Industries (II)* can be distinguished from the instant case on a number of grounds. First, to the extent that the Fourth Circuit may look unfavorably at a defendant who chooses not to follow E.E.O.C. guidelines, those guidelines have absolutely no applicability in this case as they only speak to religious practices, most commonly Sabbatarianism, that create conflicts in the workplace. *See* 29 C.F.R. § 1605.1 *et seq.* (suggesting voluntary substitutes and "swaps," flexible scheduling, and lateral transfers). The regulations do not speak to religious beliefs purported to prevent an employee from signing otherwise valid docu-

ments. Second, the Fourth Circuit only overruled *Jordan* on the narrow ground that the specific finding in *Jordan* that an absolute requirement of Sabbatarianism precluded accommodation was clearly erroneous. Thus *Jordan*'s implied holding that certain religious beliefs and practices, where "absolutist," may preclude accommodation is still good law in this circuit. Only in the context of an absolute refusal to work on the Sabbath was an exception to the language in *Jordan* found. Finally, the language in the first appellate decision that an "absolutist" position may preclude accommodation also was not contradicted by the second decision holding that, where Sabbatarianism is the religious practice, absolutism is not beyond accommodation.

Given that plaintiff both refused to sign anything related to the drug test and that he also refused to inform the union or the employer of what was his religious objection, plaintiff himself created an impasse which "render[ed] an accommodation impossible. In such a case, [Cary] himself is responsible for any failure of accommodation and [the Company] should not be held liable for such failure." *Mann,* 561 F.2d at 1285. Surely an employer cannot be required to even attempt to accommodate if its efforts at merely understanding the nature of objection are routinely thwarted. Thus, an employer will not be held liable for religious discrimination when the employee merely states that his religion prevents a common employment practice and then refuses to provide information to the employer which is necessary to the employer's duty to seek and accommodation.

Following those courts that recognize the need for a case-by-case analysis of accommodation, as well as the holding in *Jordan* that an absolutist position may preclude accommodation, this Court holds that plaintiff's failure to clarify his highly unique "belief" precluded the Company from even attempting to accommodate him. Any other result would subject employer's to the most inane demands of employees, causing severe disturbances in the workplace, solely by an employee's use of the word "religion." Cary's unduly vague and steadfast position

and refusal to cooperate provided the Company with no other alternative than to discharge plaintiff. *See E.E.O.C. v. Caribe Hilton Int'l,* 597 F.Supp. 1007, 1012 (D.P.R. 1984), *aff'd* 821 F.2d 74 (1st Cir.1987) (stating that the plaintiff's complete failure to explore the possibilities for accommodation ultimately requires a rejection of plaintiff's claim of religious discrimination). *See also Redmond,* 574 F.2d at 901–02 (stating that the concept of "mutuality of obligation" is inherent in accommodation); *Mann,* 561 F.2d at 1285 (stating that where the employee refuses to cooperate, "the employee himself is responsible for any failure of accommodation"). Essentially, the Company's burden of attempting accommodation is relieved by holding that Cary was unduly recalcitrant and resisted all efforts of the Company to even understand plaintiff's objection.

▪ At this time the Court must respond to plaintiff's main objection to the Magistrate Judge's Report and Recommendation. The plaintiff argues essentially that, because the Company had accepted plaintiff's affidavit acknowledging the notice of the future test date, the Company showed that it could reasonably accommodate Cary, possibly by accepting a form constructed by plaintiff. This argument is clearly without a basis in the facts of the case, however, as plaintiff completely failed to give the Company even a basic understanding of the nature of his objection. Furthermore, plaintiff has directly admitted that he would not "place his signature on anything associated with the drug testing program." The Company's Request for Admissions, No. 50 (to which the plaintiff did not deny). Acknowledging notice of the test and consenting to it are two completely different things, as evidenced by plaintiff's own behavior. Moreover, the Company acted with the clear understanding that plaintiff would execute the consent form. Plaintiff's objection, therefore, is specious.

### 2. *Undue Burden*

▪ Even finding that plaintiff gave proper notice of his religious objection, that it was reasonably clear that he would not sign anything related to the drug testing program, and that he should not suffer summary judgment for failing to cooperate with the defendant, would not completely preclude summary judgment against Cary. A number of Courts of Appeals have expressed the view that where an employer is faced with circumstances where the only solution to an employee's religiously-based objection constitutes an "undue burden," accommodation is not required. For example, In *Toledo,* the Tenth Circuit addressed the apparently irreconcilable conflict between the plaintiff's religious use of peyote and the requirements of his job as a truck driver:

> It would be unfair to require employers faced with such irreconcilable conflicts to attempt to futilely resolve them. Employers faced with such conflicts should be able to meet their burden by showing that no accommodation is possible.
>
> . . . .
>
> Accordingly, we hold that an employer who has made no efforts to accommodate the religious beliefs of an employee or applicant before taking action against him may only prevail if it shows that no accommodation could have been made without undue hardship. Absent this showing, failure to attempt some reasonable accommodation would breach the employer's duty to initiate accommodation of religious practices.

892 F.2d at 1489–90; *accord Brown v. Polk County, Iowa,* 61 F.3d 650, 655, 64 U.S.L.W. 2082, 2083 (en banc) (8th Cir.1995); *United States v. Board of Education for the Sch. Dist. of Philadelphia,* 911 F.2d 882, 887 (3d Cir.1990); *Hacienda Hotel,* 881 F.2d at 1512; *Smith,* 827 F.2d at 1086; *Draper v. United States Pipe & Foundry Co.,* 527 F.2d 515, 520 (6th Cir.1975).

As stated above, the Supreme Court held in *Philbrook* that "an accommodation causes 'undue hardship' whenever that accommodation results in more than a *de minimus* cost to the employer." 479 U.S. at 67, 107 S.Ct. at 371 (quoting *Hardison,* 432 U.S. at 84, 97 S.Ct. at 2276). In the present case then, a finding that the only accommodation available to the Company would have been an "undue burden" (i.e., entailed more than a *de minimis* cost) would permit summary judgment against Cary. Furthermore, *Hardison*

also provides support for the Court's position. In *Hardison,* the plaintiff employee objected to the application of the seniority system in the collective-bargaining agreement when it interfered with his desire to practice his religion, specifically to have his Sabbath free. 432 U.S. at 67–69, 97 S.Ct. at 2268–69. The Supreme Court held that the seniority-system provision took precedence over the statutory obligation to accommodate religious needs because the collective bargaining agreement was valid and important. 432 U.S. at 78–81, 97 S.Ct. at 2274–75. The Supreme Court stated:

> we do not believe that the duty to accommodate requires [defendant] to take steps inconsistent with the otherwise valid agreement. Collective bargaining, aimed at effecting workable and enforceable agreements between management and labor, lies at the core of our national labor policy.... Without a clear and express indication from Congress, we cannot agree with [plaintiff] that an agreed-upon [collective bargaining agreement provision] must give way when necessary to accommodate religious observances.

432 U.S. at 79, 97 S.Ct. at 2274. Thus, an accommodation that would violate an otherwise-valid collective bargaining agreement is an "undue burden."

■ The Supreme Court also stated that the seniority-system provision is "universally included" in collective bargaining agreements. An equally strong argument can therefore be made that drug-testing provisions today are vitally important to labor-management relations. *See, e.g.,* Article 45, Union–Anheuser–Busch Coll.Bar.Agr. (stating that "the use of illegal drugs creates serious problems for employees, their families, the workplace and the community...."); *Cary v. Teamsters Local No. 95,* 4:93cv8, at 10 (stating that the National Labor Relations Board "has held that drug and alcohol testing of current employees is a mandatory subject of bargaining"). *Cf. Lovvorn v. Chattanooga,* 846 F.2d 1539, 1544 (6th Cir.1988) (stating that "there can be no doubt that the City's interest in having its fire-fighters free from drugs is compelling."). This statement, however, is unnecessary given the Supreme

Court's much more broad holding: an otherwise valid collective bargaining agreement need not be violated to accommodate the religious objections of an employee. The clear implication of this holding, furthermore, is that the violation of an otherwise valid collective bargaining agreement would create an undue burden (i.e., more than a de minimis cost). *See, e.g., School Dist. of Philadelphia,* 911 F.2d at 891 (stating that "as held in *Hardison,* it is an undue hardship on an employer to require it to violate its collective bargaining agreement ..."); *Protos v. Volkswagen of America, Inc.,* 797 F.2d 129, 133 (3d Cir.), *cert. denied* 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986) (stating that in *Hardison,* the "reasonable accommodation requirement did not compel an employer to abrogate a collective bargaining agreement ...").

At this point a recitation of the relevant undisputed facts will be helpful. The Company's drug testing program required written consent by the employee before testing could occur and before the results could be reported to the Company. The requirement of written consent in Article 45 of the collective bargaining agreement between the Union and the Company was modeled on the confidentiality provisions of the Department of Transportation's "Controlled Substance Testing" regulations. Section 40.35 of Title 49 Of the Code of Federal Regulations states that "[e]mployer contracts with laboratories shall require that the laboratory maintain employee test records in confidence, as provided in DOT agency regulations." 49 C.F.R. § 40.35. Furthermore, Section 391.89 states that "[n]o person may obtain the individual test results retained by a medical review officer, and no medical review officer shall release the individual test results of any employee to any person, *without first obtaining authorization from the tested employee."* *Id.* § 391.89 (emphasis added). *See also International Brotherhood of Teamsters v. Dep't of Trans.,* 932 F.2d 1292, 1296 (9th Cir.1991) (interpreting and applying the confidentiality provisions). Juxtaposed against the position of the Company, plaintiff continually stated that he would never sign a document consenting to the drug testing program. Thus the parties were at an impasse,

exacerbated by plaintiff's consistent refusal to cooperate with the Company's attempts to understand plaintiff's objection.

The collective bargaining agreement was valid and applied to plaintiff, *see Cary v. Teamsters Local 95*, Civil Action No. 4:93cv8, at 10 (E.D.Va.1993), and contained an absolute requirement that dismissal must occur if written consent prior to drug testing is not forthcoming. In fact, the Union and the Company were required to negotiate terms of a drug testing program. *Id.* Here the type and nature of the manufacturing processes, including the fact that the chain of distribution of the product ultimately ends with human consumption, do warrant precautions in the nature of drug-free employees. The Company's only possible accommodation under the circumstances, then, was to grant Cary an exemption to the drug testing policy. An exemption of plaintiff from drug testing would violate the express terms of the collective bargaining agreement, which provided in Article 45, "all employees governed by the terms of this Agreement shall be subject to periodic testing for illegal drugs." Given the Supreme Court's holding that the contravention of an otherwise valid collective bargaining agreement was not required by Title VII, and the conclusions that such would automatically result in an undue burden (or more than a *de minimis* cost) on the employer, and that efforts at accommodation are not necessary if they clearly would create an undue burden, as a matter of law this Court holds that plaintiff's position required nothing short of an accommodation with more than a *de minimis* cost. Summary judgment is therefore appropriate.

The Court is further persuaded by the likelihood that drug testing programs fit within the statutory provisions of Title VII directly. The Supreme Court in *Hardison* reviewed the provisions of Title VII and stated that according to the statute, seniority systems should be accorded special treatment. The Supreme Court quoted Section 703(h) of Title VII, and then found that bona fide seniority systems were presumptively non-discriminatory. 432 U.S. at 81–82, 97 S.Ct. at 2275–76. In fact the provision directly addresses seniority systems. The provision provides:

> Notwithstanding any other provision of this title ... it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system ... provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, *nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test,* its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(h) (emphasis added). It is by no means stretching the language beyond its intended meaning to find that drug testing is a "professionally developed ability test." Article 45 of the Collective Bargaining Agreement explicitly states that "the use of illegal drugs creates serious problems for employees, their families, the workplace and the community...." *Cf. Rushton v. Nebraska Public Power District*, 653 F.Supp. 1510 (D.Neb.1987), *aff'd* 844 F.2d 562 (8th Cir. 1988) (holding that a the Free Exercise clause of the First Amendment did not require an exemption for employees who objected on religious grounds to a drug testing program promulgated by an employer to determine the fitness of employees in a nuclear power plant); *Willner v. Thornburgh*, 928 F.2d 1185, 1192 (D.C.Cir.) *cert. denied sub nom. Willner v. Barr*, 502 U.S. 1020, 112 S.Ct. 669, 116 L.Ed.2d 760 (1991) (stating that "[r]ecent empirical studies have shown that individuals who test positive in pre-employment drug tests have higher rates of absenteeism and involuntary separation."); *Lovvorn*, 846 F.2d at 1561 (Guy, C.J., dissenting) (stating that job performance weighs in favor of drug testing). Thus drug testing itself, as a professionally developed ability test and when applied without discrimination, presumptively cannot violate Title VII. *See Rushton*, 653 F.Supp. 1510.

The purpose of the above discussion about drug testing programs is not to uphold their legality in the face of religious objections. Plaintiff has not made such an claim. Where the plaintiff claims, however, that he cannot be required to sign a consent form for drug testing, and where the result of failing to sign a consent form is that the drug testing cannot be completed, for this Court to find that no accommodation was possible, and therefore an undue burden would result, the court must first recognize the validity of the drug testing program itself. Otherwise, if the program were not valid, then a reasonable accommodation might be an exemption from the program itself. Here the drug testing program is valid. A religious objection under these circumstances, if upheld, could only result in the failure to complete the testing, and the exemption from testing would be in contravention of the valid collective bargaining agreement. Plaintiff's position as a matter of law afforded defendant no opportunity to accommodate short of an undue burden.

In this case, the plaintiff has steadfastly objected to signing any consent form, yet written consent must be given for drug testing to occur and the results to be forwarded to the employer. Where failure to consent to drug testing as prescribed in an otherwise valid collective bargaining agreement results in dismissal, and where plaintiff has been so terminated, as a matter of law accommodation, which can only mean an exception from the drug testing program, is not possible without creating an undue burden. Summary judgment for defendant therefore is proper.

### IV. *Conclusion*

The Court finds four separate grounds for granting the Company's motion, any one of which it finds would sustain summary judgment against the plaintiff. These grounds are: (1) plaintiff's case is not in fact a religious discrimination case but rather a dispute about the Union's ability to represent him before his employer; (2) plaintiff failed to adequately notify defendant of his religious objection (if it was such) to signing the consent form, thus failing to present a prima facie case of religious discrimination in employment; (3) plaintiff failed to cooperate with defendant in the search for an accommodation by failing to respond to defendant's inquiries as to the specifics of plaintiff's objection, accommodation by the defendant was precluded as a matter of law; and, (4) plaintiff's position necessarily allowed for only one accommodation, i.e., an exemption from an otherwise valid drug testing program, an undue burden would have been forced upon defendant and thus was not required.

For any one of the foregoing alternate reasons, the objection to the Magistrate Judge's Report and Recommendation is overruled and the motion by Anheuser–Busch, Inc. for summary judgment is GRANTED and judgment entered for defendant Anheuser–Busch, Inc. The individual defendants Carmichael, Posey and Mandaro are further DISMISSED WITH PREJUDICE.

The Clerk of the Court is DIRECTED to forward copies of this order to counsel for the parties.

IT IS SO ORDERED.